**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **JOE HAND PROMOTIONS, INC.,** | : | |
| *Plaintiff*, | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | |
| | : | |
| **VICTOR YAKUBETS and** | : | |
| **CAFÉ NOSTALGIE, INC.,** | : | **No. 12-4583** |
| *Defendants*. | : | |

# O P I N I O N

PRATTER, J.                                                    MARCH 11, 2014

In Joe Hand Promotions, Inc.'s ("Joe Hand") Renewed Motion for Default Judgment (Docket No. 14), Joe Hand seeks statutory and enhanced damages for Café Nostalgie and Victor Yakubets's unlawful interception of cable programming under 47 U.S.C. § 553(a)(1);[1] vicarious liability against Mr. Yakubets; and leave to move for attorneys' fees and costs. Because Joe Hand is entitled to damages, the Court grants the Motion as set out below. But to determine the appropriate amount, and who is liable therefor, the Court must consider several issues not yet addressed by the Third Circuit Court of Appeals and to which district courts have adopted a variety of approaches.

An unopposed motion for default judgment can be a tempting invitation to defer automatically to, or at least consider more charitably, the plaintiff's view of the law in addition to his allegations of fact. The invitation is all the more tempting because of the work-intensive paradox that results from declining it: While in our adversarial system, a court's acting *sua sponte* is the exception to the rule, a court evaluating a motion for default judgment must itself

---

[1] "No person shall intercept or receive or assist in intercepting or receiving any communications service offered over a cable system, unless specifically authorized to do so by a cable operator or as may otherwise be specifically authorized by law." 47 U.S.C. § 553(a)(1).

ask whether the plaintiff's complaint states claim(s) upon which relief can be granted. Where the complaint fails to state a claim, therefore, the paradox is that the defendant may have better luck by defaulting before an attentive (but unassisted) court than by engaging (and paying) a lawyer who, for one reason or another, fails to have the same causes dismissed early on with a Rule 12(b)(6) motion.

If, by contrast, the district court accepts the plaintiff's invitation and grants its imprimatur to the plaintiff's unchallenged legal *theory*, the court risks making bad law, even though that law is only persuasive authority, and even though the court is "confined from molar to molecular motions." *S. Pac. Co. v. Jensen*, 244 U.S. 205, 221 (1917) (Holmes, J., dissenting). This risk is especially dangerous where a region of the legal landscape is typified by defaults, for default judgments not only often result from one-sided proceedings, but also rarely weather the appellate scrutiny necessary to ensure the law's uniformity. The unintended consequence of different rules or applications to similar cases is not only the erosion of the principle that the rule of law comprises the justice of similar treatment for similar circumstances, but also the loss of one of the principal aims of the law: predictability or certainty, such that persons and entities, good or bad, may understand the law's limits and adjust their behavior accordingly. *See* Oliver Wendell Holmes, Jr., *The Path of the Law*, 10 Harv. L. Rev. 457, 459-60 (1897). As Justice Holmes explained, "Far the most important and pretty nearly the whole meaning of every new effort of legal thought is to make these prophecies more precise, and to generalize them into a thoroughly connected system. . . . The prophecies of what the courts will do in fact, and nothing more pretentious, are what [is] mean[t] by the law." *Id.* at 457-58, 461-62. Where the appellate courts have little opportunity to map the contours of certain statutory terrain, as with 47 U.S.C. § 553 here, litigants must contend with district courts' differing measurements of the same topography.

For good or ill, this Court sees its duties as including sowing seeds in the legal landscape so that its harvests will be better anticipated, if not better understood.

A survey of district court decisions on § 553 (and its satellite analog, 47 U.S.C. § 605) shows a variety of approaches to, and therefore outcomes under, the following questions presented in this case: First, how should "statutory damages" be measured under 47 U.S.C. § 553(c)(3)(A)(ii), which , when taken alone, reveals few of which factors should be considered? Second, what must a plaintiff prove—or allege, at the default judgment stage—to show that the defendant committed the § 553 violation "willfully and for purposes of commercial advantage or private financial gain," § 553(c)(3)(B), and thus trigger the court's exercise of discretion to award the plaintiff so-called "enhanced damages"? And what factors should guide this decision? Finally, under what circumstances, if any, may an individual or entity be held vicariously liable for a violation of § 553, and how much is required to plead sufficiently such vicarious liability? And if a defendant is vicariously liable, is he jointly and severally liable?

For these reasons, in order to grant Joe Hand's Motion, the Court both surveys the legal terrain and discusses several approaches to the issues posed in an attempt to provide reasoned guideposts rather than Delphic pronouncements.

## I.      FACTUAL AND PROCEDURAL HISTORY

Joe Hand, an international closed-circuit distributor of sports and entertainment programming, purchased the exclusive nationwide commercial distribution rights to broadcast the boxing match *"The Big Challenge": Adamek v. Grant* ("the Match") on August 21, 2010. Joe Hand then spent substantial sums marketing the Match to commercial establishments, some of which purchased sublicenses from Joe Hand to exhibit the Match to their customers.

Café Nostalgie is a restaurant in Philadelphia, Pennsylvania. On the night of August 21, 2010, without such a sublicense, Café Nostalgie intercepted and broadcast the Match to its patrons on four televisions, as observed by Joe Hand's investigator, Daniel Szlezak. *See* Hand Aff. ¶ 7 (Docket No. 8); Szlezak Aff. (Docket No. 7-3). Because Café Nostalgie's reception of the Match was unlicensed, the interception violated either 47 U.S.C. § 553(a)(1) ("Unauthorized interception or receipt" of "any communications service offered over a cable system") or 47 U.S.C. § 605(a) ("No person not being authorized by the sender shall intercept any radio communication and divulge or publish the existence, contents, substance, purport, effect, or meaning of such intercepted communication to any person. . . ."). *See also generally Joe Hand Promotions, Inc. v. Yakubets*, No. 12-4583, 2013 WL 5224123 (E.D. Pa. Sept. 17, 2013).

Joe Hand subsequently brought suit against Café Nostalgie and Victor Yakubets, who is identified on Café Nostalgie's Liquor Control Board License as President, Secretary/Treasurer, Director, Stockholder, and Manager/Steward, and who Joe Hand thus alleges had the right and ability to supervise the activities of Café Nostalgie and its employees. Although both Mr. Yakubets and Café Nostalgie appear to have been properly served, *see Yakubets*, 2013 WL 5224123, at *1, they failed to appear or answer Joe Hand's Complaint, and the Clerk of Court entered their default, *see* Fed. R. Civ. P. 55(a). Joe Hand then moved for default judgment under 47 U.S.C. § 605 and the tort of conversion (Docket No. 7), *see* Fed. R. Civ. P. 55(b)(2).

The Court concluded that because Joe Hand did not allege or subsequently show how Café Nostalgie intercepted the Match (i.e., by satellite or cable), Joe Hand could proceed only under 47 U.S.C. § 553, which governs cable transmissions:

> [W]here a plaintiff's complaint pleads claims under both §§ 553 and 605, but at the default judgment stage the plaintiff can prove neither with individual specificity, then § 553 will be applied. A presumption in favor of § 553 is the more principled and persuasive approach. Because a defendant cannot violate both sections with the same conduct—"§ 605 encompasses the interception of

satellite transmissions" whereas "[o]nce a satellite transmission reaches a cable system's wire distribution phase, it is subject to § 553 and is no longer within the purview of § 605," *TKR Cable Co. v. Cable City Corp.*, 267 F.3d 196, 207 (3d Cir. 2001)— . . . the substantive law itself forces a determination of which statute applies. But the enigmatic approach of awarding damages under "either statute," even if expedient or practical, cannot be the general rule. For one, the syllogism that proves that a plaintiff violated either § 553 or § 605 lacks sufficient bandwidth to allow the plaintiff to proceed under § 605: if § 553 did not exist, neither would the syllogism, and such plaintiffs would be entitled to nothing.

Second, the fact that § 553(c)(3)(A)(ii)'s and § 605(e)(3)(C)(i)(II)'s damage ranges *sometimes* overlap cannot support the adoption of a categorical rule that damages may be awarded under either. . . . Additionally, while costs and attorneys' fees must be awarded under § 605, the court may decline to award them under § 553.

In addition, the presumption that § 553 applies absent any evidence of interception by satellite is a more principled approach. The fundamental principle that a plaintiff in a civil lawsuit must prove his case by a preponderance of the evidence dictates that if he can present only insufficient evidence of a particular wrong, he should not be entitled to relief. Although it may be clear from the facts alleged, and accepted as true on a motion for default judgment, that a violation of either § 605 or § 553 must have occurred, in such a situation the plaintiff has not discharged that burden of proof with respect to either. If they had a choice, plaintiffs in every such case would elect to proceed under § 605: its damage range is higher than § 553's, and it applies upon *each* violation. But in each such case, the plaintiff will have failed to allege a necessary element of § 605(a), to wit, radio transmission by satellite. *See* 47 U.S.C. § 605 ("No person not being authorized by the sender shall intercept any radio communication and divulge or publish the existence, contents, substance, purport, effect, or meaning of such intercepted communication to any person. . . ."). Thus, notwithstanding the similar remedial schemes of the two statutes, in the absence of evidence of a violation subjecting the defendant to greater damages (§ 605), the plaintiff should be restricted to pursuing damages under § 553.

Practical reasons also support channeling plaintiffs through § 553 under these circumstances: "a cable box is more easily hidden" than a satellite dish. *J&J Sports Prods., Inc. v. Guzman,* No. 08-05469, 2009 WL 1034218, at *2 (N.D. Cal. Apr. 16, 2009). As a result, where a defendant has somehow intercepted a signal but the means remain undiscovered—subterranean or up in the air—then, "unlike § 605, a permissible inference can be drawn with respect to § 553." *Ayala*, 2012 WL 4097754, at *2; *accord Guzman,* 2009 WL 1034218, at *2; *cf. J&J Sports Prods., Inc. v. Saucedo, Inc.* No. 12-04657, 2013 WL 2384258, at *4 (N.D. Cal. May 30, 2013) ("[T]he investigator indicated that Defendant's establishment does not have a satellite dish. As a result, Defendant most likely intercepted the program via a cable signal in violation of Section 553." (citation omitted)). Third-party subpoenas and orders for inspection to one side, a plaintiff who has gone to the trouble of sending an investigator to a defendant's establishment, as here, can at

5

the very least ask the investigator to keep his antennae up for evidence of a satellite dish.

*Yakubets*, 2013 WL 5224123, at *4-5 (some citations and footnotes omitted and/or reformatted).[2]

For these reasons, the Court denied Joe Hand's Motion for Default Judgment with prejudice as to § 605 and invited Joe Hand to move again under § 553 (Docket Nos. 11–13).[3] Joe Hand's Renewed Motion for Default Judgment is now before the Court. Joe Hand did "not request a hearing on damages," Br. 8-9 n.4 (Docket No. 14-1), but rather relies on its submissions on the Docket, including the affidavits of Joe Hand, Jr., Joe Hand's President (Docket No. 8), and Daniel Szlezak, who investigated the unlawful interception of the Match

---

[2] A number of decisions, particularly in the Northern District of California, the courts of which appear to have had a great deal of experience with such cases, have adopted a presumption that § 553 rather than § 605 applies at the default judgment stage when there is no allegation of or evidence regarding the means of interception. *E.g.*, *G&G Closed Circuit Events, LLC v. Espinoza*, No. 12-6349, 2013 WL 4520018, at *3 (N.D. Cal. Aug. 23, 2013); *J&J Sports Prods., Inc. v. Saucedo*, No. 10-5131, 2011 WL 4536947, at *2 (N.D. Cal. Sept. 30, 2011); *G&G Closed Circuit Events, LLC v. Nguyen*, No. 10-5715, 2011 WL 4536949, at *2 (N.D. Cal. Sept. 30, 2011); *Joe Hand Promotions, Inc. v. Juarez*, No. 10-5580, 2011 WL 4590918, at *2 (N.D. Cal. Sept. 30, 2011); *Joe Hand Promotions, Inc. v. Nguyen*, No. 10-5856, 2011 WL 4551454, at *2 (N.D. Cal. Sept. 30, 2011); *J&J Sports Prods., Inc. v. Pimental*, No. 10-5098, 2011 WL 2883345, at *2 (N.D. Cal. July 17, 2011); *J&J Sports Prods., Inc. v. Aviles*, No. 10-4213, 2011 WL 1884617, at *4 (N.D. Cal. May 18, 2011); *Joe Hand Promotions, Inc. v. RPM Mgmt. Co. LLC*, No. 09-0553, 2011 WL 1043560, at *3 (S.D. Ohio Mar. 18, 2011); *J&J Sports Prods., Inc. v. Cortez*, No. 10-2717, 2011 WL 311375, at *2 (N.D. Cal. Jan. 28, 2011); *J&J Sports Prods., Inc. v. Canedo*, No. 09-01488, 2009 WL 4572740, at *7-8 (N.D. Cal. Dec. 1, 2009); *J&J Sports Prods., Inc. v. Doan*, No. 08-0324, 2008 WL 4911223, at *3 (N.D. Cal. Nov. 13, 2008); *J&J Sports Prods., Inc. v. Wood*, No. 11-1160, 2011 WL 6961334, at *4 (N.D. Cal. R&R Nov. 2, 2011), *adopted*, 2012 WL 33258 (Jan. 6, 2012).

On the other hand, a plaintiff's investigative efforts may be rewarded. *See, e.g.*, *J&J Sports Prods., Inc. v. Arboleda*, No. 09-0467, 2009 WL 3490859, at *4-5 (M.D. Fla. Oct. 27, 2009) (granting default judgment under § 605 rather than § 553 where "evidence that the Restaurant has satellite is provided by the auditors, . . . who attested to the existence of satellite receivers on the outside of Defendants' establishment" (footnote omitted)).

[3] The Court also denied the Motion for Default Judgment without prejudice as to the tort of conversion because Joe Hand cited only California authorities. Joe Hand has abandoned its conversion claim in the Renewed Motion. *See* Br. 3 (Docket No. 14-1).

(Docket No. 7-3), and Café Nostalgie's liquor license, of which Joe Hand has submitted a copy

(Docket No. 7-3) and of which the Court may also take judicial notice.[4]

## II.   THE DEFAULT JUDGMENT STANDARD OF REVIEW

Federal Rule of Civil Procedure 55 charts the course a plaintiff must navigate to obtain a

default judgment against a nonresponsive defendant. First, if the plaintiff shows the defendant's

"fail[ure] to plead or otherwise defend, . . . the clerk must enter [the defendant's] default," Fed.

R. Civ. P. 55(a), which is valid only if the defendant was properly served. *See Petrucelli v.*

*Bohringer & Ratzinger*, 46 F.3d 1298, 1304 (3d Cir. 1995).

The plaintiff may then "apply to the court for a default judgment." Fed. R. Civ. P.

55(b)(2).[5] The court's initial inquiry is "whether the unchallenged facts constitute a legitimate

cause of action." 10A Charles Alan Wright, Arthur R. Miller, et al., *Federal Practice and*

---

[4] *See* Fed. R. Civ. P. 201(b)(2) ("The court may judicially notice a fact that is not subject to reasonable dispute because it can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."). The liquor license, issued by the Pennsylvania Liquor Control Board, may be accessed through the Liquor Control Board's "License Search System" by searching for number R-15626 at http://www.lcbapps.lcb.state.pa.us/webapp/ Agency/SearchCenter/PublicLicenseeSearchDefault.asp. What facts may be noticed, and how, depend "on the circumstances of the instant case" and the stage of the proceeding. *S. Cross Overseas Agencies, Inc. v. Wah Kwong Shipping Grp. Ltd.,* 181 F.3d 410, 426-27 & n.7 (3d Cir. 1999).

[5] The court may not grant a motion for default judgment unless the clerk of court has first entered default under Federal Rule of Civil Procedure 55(a). *E.g.*, *Husain v. Casino Control Comm'n*, 265 F. App'x 130, 133 (3d Cir. 2008) (citing 10A Charles Alan Wright, Arthur R. Miller, et al., *Federal Practice and Procedure* § 2682 (3d ed. 2013)). It is not uncommon for litigants (and even their lawyers) to fail to appreciate that there is a difference between a "default" governed by Federal Rule of Civil Procedure 55(a) and a "default *judgment*" authorized by Rule 55(b).

"If the plaintiff's claim is for a sum certain or a sum that can be made certain by computation," the plaintiff may apply for default judgment by affidavit to the clerk instead of the court. Fed. R. Civ. P. 55(b)(1). But "a claim is not a sum certain unless there is no doubt as to the amount to which a plaintiff is entitled as a result of the defendant's default." *KPS & Assocs., Inc. v. Designs by FMC, Inc.*, 318 F.3d 1, 19 (1st Cir. 2003). The claim in this case is not a sum certain.

*Procedure* § 2688 (3d ed. 2013) (citing cases).[6] As at the motion to dismiss stage, the court accepts as true the well-pleaded factual allegations in the plaintiff's complaint, except those relating to damages, as though they were admitted or established by proof, *Comdyne I, Inc. v. Corbin*, 908 F.2d 1142, 1149 (3d Cir. 1990), as well as all reasonable inferences that can be drawn from the complaint, *e.g.*, *Yang v. Hardin*, 37 F.3d 282, 286 (7th Cir. 1994). Conclusory allegations and the parties' legal theories or "conclusions of law" are not entitled to the same presumption and are not deemed admitted. Wright & Miller, *supra*, § 2688.[7]

If the court determines that the plaintiff has stated a cause of action, it must then assess damages. Unlike liability, unless damages are "liquidated or computable," they "cannot be awarded simply on the basis of the pleadings, but must instead be established at an evidentiary hearing held pursuant to [Rule] 55(b)(2)," *Comdyne I*, 908 F.2d at 1152, or otherwise by such proof as the plaintiff may submit without a hearing.[8]

---

[6] *Accord, e.g.*, *Pope v. United States*, 323 U.S. 1, 12 (1944) ("[U]pon default, . . . the court determines that the unchallenged facts shown of record establish a legally binding obligation; it adjudicates the plaintiff's right of recovery and the extent of it, both of which are essential elements of judgment." (citations omitted)); *Chanel, Inc. v. Gordashevsky*, 558 F. Supp. 2d 532, 536 (D.N.J. 2008); *see also, e.g.*, *Thomson v. Wooster*, 114 U.S. 104, 113 (1885) ("[A] decree *pro confesso* is not a decree as of course according to the prayer of the bill, nor merely such as the complainant chooses to take it; but that it is made (or should be made) by the court, according to what is proper to be decreed upon the statements of the bill assumed to be true.").

[7] Notwithstanding the evident "confusion" in some cases regarding "[t]he distinction between [a] defendant's concession, by defaulting, of the facts in plaintiff's complaint and a finding that liability is established," Wright & Miller, *supra*, § 2688, the distinction would seem to be especially important in the wake of the Supreme Court's decisions in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). Moreover, Rule 55(b)(2) recognizes the potential propriety of a variety of inquiries, including, in addition to "determin[ing] the amount of damages," the potential need to "establish the truth of any allegation by evidence" or "investigate any other matter." Fed. R. Civ. P. 55(b)(2).

[8] Rule 55(b)(2)'s language regarding hearings is permissive. If the court can determine the amount of damages to be awarded based on affidavits or other evidentiary materials, "[t]he Court is under no requirement to conduct an evidentiary hearing with testimony." *E. Elec. Corp. of N.J. v. Shoemaker Constr. Co.*, 657 F. Supp. 2d 545, 552 (E.D. Pa. 2009); *see Rainey v. Diamond State Port Corp.*, 354 F. App'x 722, 724 (3d Cir. 2009) ("If it is necessary to determine the

Default judgments are disfavored, *see Farnese v. Bagnasco*, 687 F.2d 761, 764 (3d Cir. 1982); the default judgment context usually offers none of the adversarial argument upon which the American legal system is founded and which remains a pillar of courts' ability to make informed and well-reasoned decisions. Thus, under *Chamberlain v. Giampapa*, 210 F.3d 154 (3d Cir. 2000), the district court must examine three additional factors to determine whether it should grant a default judgment: "(1) prejudice to the plaintiff if default is denied, (2) whether the defendant appears to have a litigable defense, and (3) whether defendant's delay is due to culpable conduct." *Chamberlain*, 210 F.3d at 164.

"Considerable delays," especially those that might "stretch on indefinitely," are sufficient to show prejudice to the plaintiff. *Grove v. Rizzi 1857 S.P.A.*, No. 04-2053, 2013 WL 943283, at *2 (E.D. Pa. Mar. 12, 2013) (citation omitted).[9] Second, outside of the court's obligation to decide whether it has jurisdiction and whether the complaint states a claim, the court may presume that an absent defendant who has failed to answer has no meritorious defense, *e.g.*, *Doe v. Simone*, No. 12-5825, 2013 WL 3772532, at *5 (D.N.J. July 17, 2013), because "[i]t is not the court's responsibility to research the law and construct the parties' arguments for them," *Econ. Folding Box Corp. v. Anchor Frozen Foods Corp.*, 515 F.3d 718, 721 (7th Cir. 2008). Third, the defendant's failure or refusal to "enage[] in the litigation process and [to] offer[] no reason for this failure or refusal" may "qualif[y] as culpable conduct with respect to the entry of a default

---

amount of damages or to establish the truth of any averment by evidence, the court *may* conduct a hearing." (emphasis added and internal quotation marks omitted in *Rainey*) (quoting *Durant v. Husband*, 28 F.3d 12, 15 (3d Cir. 1994) (quoting Fed. R. Civ. P. 55(b)(2)))).

[9] "Delay in realizing satisfaction on a claim rarely serves to establish the degree of prejudice sufficient to prevent the *opening* [of] a default judgment" in favor of a defendant who has appeared, *Feliciano v. Reliant Tooling Co., Ltd.*, 691 F.2d 653, 656-57 (3d Cir. 1982) (emphasis added), but the standard must apply differently when the district court is evaluating whether to *grant* default judgment against an absent defendant. *Cf. Chamberlain*, 210 F.3d at 164 (holding that default judgment was not warranted where the defendant answered late, but answered). *See also infra* note 11.

judgment—indeed, for the Court to conclude otherwise would be to reward the recalcitrant or the oppositional and uncooperative." *E. Elec. Corp. of N.J. v. Shoemaker Constr. Co.*, 657 F. Supp. 2d 545, 554 (E.D. Pa. 2009).

The district court's evaluation of these factors is reviewed for abuse of discretion[10] and tends to be perfunctory because "when a defendant has failed to appear or respond in any fashion to the complaint, th[e] analysis is necessarily one sided." *T&C Leasing Inc. v. BBMC, LLC*, No. 09-873, 2010 WL 231128, at *1 (M.D. Pa. Jan. 14, 2010) (citing *Anchorage Assocs. v. V.I. Bd. of Tax Review*, 922 F.2d 168, 177 n.9 (3d Cir. 1990)). Thus, "entry of default judgment is typically appropriate in such circumstances at least until the defendant comes forward with a motion to set aside the default judgment pursuant to Rule 55(c)." *Id.*; *cf. Feliciano v. Reliant Tooling Co., Ltd.*, 691 F.2d 653, 657 (3d Cir. 1982) ("[P]rejudice suffered by a non-defaulting party can often be rectified through the trial court's power under Rule 60(b) to impose terms and conditions upon the opening of a judgment."); *Gross v. Stereo Component Sys., Inc.*, 700 F.2d 120, 124 (3d Cir. 1983) (explaining that a defendant who appears after the entry of default judgment may show that his conduct was not "taken willfully or in bad faith").[11]

---

[10] *See Chamberlain*, 210 F.3d at 164 (refusal to grant default judgment); *United States v. $55,518.05 in U.S. Currency*, 728 F.2d 192, 195 (3d Cir. 1984) (refusal to set aside default judgment); *Farnese*, 687 F.2d at 763-64 (refusal to set aside default judgment).

[11] The Third Circuit Court of Appeals has for the most part elaborated these default judgment factors and their application in the context of considering whether a default or default judgment *already granted* should or should not have been set aside. *See United States v. $55,518.05 in U.S. Currency*, 728 F.2d 192 (3d Cir. 1984); *Farnese*, 687 F.2d 761; *see also, e.g.*, *Emcasco Ins. Co. v. Sambrick*, 834 F.2d 71 (3d Cir. 1987); *Tozer v. Charles A. Krause Mill. Co.*, 189 F.2d 242 (3d Cir. 1951). This tendency makes sense: an absent defendant cannot appeal a default judgment. But the two contexts are different, and the factors cannot be applied identically. For one, while setting aside a default judgment allows the parties to proceed on the merits—the favored alternative—denying default judgment in favor of a plaintiff who has stated a cause of action entitling him to relief and against an absent defendant produces no such favorable outcome.

In fact, "[i]n the context of a completely one-sided proceeding, the Court questions the factors' analytical value. This is because all three factors tend to be resolved against the

## III.    DISCUSSION

Section 553(a) of Title 47, U.S. Code, provides that "[n]o person shall intercept or receive or assist in intercepting or receiving any communications service offered over a cable system, unless specifically authorized to do so by a cable operator or as may otherwise be specifically authorized by law." 47 U.S.C. § 553(a)(1). The statute provides a civil cause of action that may be brought by "[a]ny person aggrieved by any violation" of the prohibition of interception or reception, *id.* at § 553(c)(1), as well as criminal penalties, *id.* § 553(b). *See also TKR Cable Co.*, 267 F.3d at 207. Because the Match in this case was broadcast over cable and satellite, and Café Nostalgie intercepted it, Café Nostalgie must have done so either by cable or satellite. In the absence of any evidence to indicate which method was used, the Court applied the presumption that the interception was by cable. *Yakubets*, 2013 WL 5224123, at *4-5.

The Court concludes that Joe Hand is entitled to both statutory and enhanced damages under § 553(c)(3)(A)(ii) and § 553(c)(3)(B), respectively, for Café Nostalgie's violation of § 553(a)(1). Under the test the Court adopts from copyright law, as have a number of other courts, Joe Hand is also entitled to a judgment of vicarious liability against Mr. Yakubets, but to a limited extent. Finally, Joe Hand may move for attorneys' fees and costs under § 553(c)(2)(C). In arriving at these conclusions, the Court relies on the well-pleaded factual allegations in Joe Hand's Complaint, and the reasonable inferences that may be drawn from them, as well as the

---

defaulting party simply by virtue of that party's absence." *Joe Hand Promotions, Inc. v. Waldron*, No. 11-0849, 2013 WL 1007398, at *4 n.4 (D.N.J. Mar. 13, 2013). A panel of the Third Circuit Court of Appeals has agreed in dicta: "*Chamberlain*, perhaps counterintuitively, applies this three-part test to the motion seeking a default judgment whereas the case on which Chamberlain relies—*$55,518.05 in U.S. Currency*—sets out the test in the context of a motion to overturn a default judgment." *Hill v. Williamsport Police Dep't*, 69 F. App'x 49, 51 (3d Cir. 2003); *see also id.* at 51 n.3; *id.* at 52-53 (Rendell, J., concurring). Judge Rendell has noted that "there is persuasive authority for the proposition that these decisions should be left wholly within the sound discretion of the district courts, taking into consideration a broad set of factors." *Id.* at 53. In any case, courts have tended to apply the factors *mutatis mutandis*.

documentary evidence Joe Hand has submitted on the Docket. None of the three *Chamberlain*

factors counsel against entering default judgment.[12]

### A.    Statutory and Enhanced Damages under 47 U.S.C. § 553

A plaintiff may recover two types of damages under § 553. First, "plaintiffs [may] choose

between actual damages or statutory damages" under § 553(c)(3)(A), *Gen. Instrument Corp. of*

*Del. v. Nu-Tek Elecs. & Mfg., Inc.*, 197 F.3d 83, 95 (3d Cir. 1999), which provides:

> Damages awarded by any court under this section shall be computed in
> accordance with either of the following clauses:
>> **(i)** the party aggrieved may recover the actual damages suffered by him as
>> a result of the violation and any profits of the violator that are attributable to
>> the violation which are not taken into account in computing the actual
>> damages; in determining the violator's profits, the party aggrieved shall be
>> required to prove only the violator's gross revenue, and the violator shall be
>> required to prove his deductible expenses and the elements of profit
>> attributable to factors other than the violation; or
>> **(ii)** the party aggrieved may recover an award of statutory damages for all
>> violations involved in the action, in a sum of not less than $250 or more than
>> $10,000 as the court considers just.

47 U.S.C. § 553(c)(3)(A). Because "[t]here are no mens rea or scienter elements" under § 553(a),

defendants are strictly liable for actual or statutory damages. *E.g.*, *J&J Sports Prods., Inc. v. De*

*La Cerda*, No. 11-1896, 2013 WL 5670877, at *5 (E.D. Cal. Oct. 16, 2013) (citation omitted).[13]

---

[12] Because the Clerk of Court entered Café Nostalgie's and Mr. Yakubets's defaults on
January 23, 2013, and since that time, neither Defendant has appeared or responded to Joe
Hand's Complaint, Motion for Default Judgment, or Renewed Motion for Default Judgment, the
Court finds that there is little chance that either Defendant will respond and, therefore, finds that
the delay could continue indefinitely. Therefore, Joe Hand shown sufficient prejudice. Further,
the Court has federal question jurisdiction and, as set out in this Opinion and *Yakubets*, 2013 WL
5224123, Joe Hand has stated a claim under § 553 and also its entitlement to statutory damages,
enhanced damages, and Victor Yakubets's vicarious liability. Finally, Café Nostalgie's and Mr.
Yakubets's failures to respond must be presumed to be due to culpable conduct—with the caveat
that either of them can move to set aside the default judgment granted here.

[13] Still, "[i]n any case where the court finds that the violator was not aware and had no reason
to believe that his acts constituted a violation of this section, the court in its discretion may
reduce the award of damages to a sum of not less than $100." 47 U.S.C. § 553(c)(3)(C).

Second, § 553 also provides for what courts have termed "enhanced damages":

> In any case in which the court finds that the violation was committed willfully and for purposes of commercial advantage or private financial gain, the court in its discretion may increase the award of damages, whether actual or statutory under subparagraph (A), by an amount of not more than $50,000.

47 U.S.C. § 553(c)(3)(B). Thus, a particular mental state is required for enhanced damages.

Joe Hand requests statutory and enhanced damages in an amount "that both sufficiently compensates [it] and functions as an effective deterrent." Br. 9. But while the terms of the statutory and enhanced damages subsections afford courts discretion in assessing damages (by awarding an amount of statutory damages it "considers just," of up to $10,000, 47 U.S.C. § 553(c)(3)(A)(ii), or of enhanced damages, "in its discretion," of up to $50,000, *id.* § 553(c)(3)(B)), neither subsection spells out what factors should be considered. Nor, as Joe Hand notes, has the Third Circuit Court of Appeals provided "a formula for calculating damages" under § 553.[14] The first task, then, is to outline the parameters of the court's discretion.

### 1.  Statutory Damages under § 553(c)(3)(A)(ii)

#### a.  The measurement of statutory damages

Joe Hand argues that because § 553 is aimed at reducing signal piracy, deterrence is an appropriate consideration for determining statutory damages under § 553(c)(3)(A)(ii). Br. 10. Such methodology has tended to produce damages at the higher end of the case law's spectrum.

---

[14] Joe Hand actually states, "The Third Circuit has not set established [sic] a formula for calculating damages under 47 U.S.C. *§ 605*," Br. 11 (emphasis added), but the point is true for § 553. The Court also observes that Joe Hand cites cases interpreting § 605, as opposed to § 553. *See* Br. 10-11 (citing, inter alia, *J&J Sports Prods., Inc. v. Braz. Paradise, LLC*, 789 F. Supp. 2d 669, 676-77 (D.S.C. 2011), and *J&J Sports Prods., Inc. v. Herrera*, No. 10-02090, 2011 WL 643413, at *4 (E.D. Cal. Feb. 17, 2011)). The Court recognizes that the history and aim of the statutes may be similar, and thus the case law interpreting them, as well. The Court also recognizes that a number of courts have mixed the analysis in the default judgment context by awarding amounts that would satisfy both statutes. *See supra* note 2 and accompanying text. The Court has attempted to indicate when it is citing or discussing § 605 case law. Joe Hand's counsel should likewise endeavor to be more precise and explicit in his citation and discussion.

For instance, Joe Hand cites to a case proposing that a statutory damages award should be "enough to deter defendants and others like them from engaging in such conduct again," and thus can be "well in excess of the probable licensing fee,"[15] and another case finding "deterrence needed" and employing a per-patron approach as "an appropriate penalty."[16]

The Court disagrees with this approach. While deterrence is a universal issue addressed by § 553—the cause of action itself is a general deterrent, and there is no doubt "that Congress drafted the provision to deter the newly emergent and previously unaddressed cable piracy," *TKR Cable Co.*, 267 F.3d at 204—deterrence as a factor is better considered under the enhanced damages rubric, which requires a showing of willfulness, *see* 47 U.S.C. § 553(c)(3)(B), than the statutory damages provision, which imposes strict liability. The Court thus agrees with the First Circuit Court of Appeals, the only appellate court to have addressed the aim and evaluation of § 553's statutory damages, that statutory damages should be "based solely on the estimated value of the services stolen, without consideration of other harms . . . or of other policies favoring deterrence." *Charter Commc'ns Entm't I, DST v. Burdulis*, 460 F.3d 168, 181 (1st Cir. 2006). Because "statutory damages are merely an alternative to actual damages," they "should be 'as reasonable an estimate of actual damages as the facts . . . allow,' not greater." *Id.* (alteration in original) (quoting *Comcast of Mass. I, Inc. v. Naranjo*, 303 F. Supp. 2d 43, 48 (D. Mass. 2004)). Several reasons support evaluating statutory damages as an estimate of actual damages and not increasing them as a penalty or deterrent.

---

[15] *Kingvision Pay-Per-View, LTD. v. Lardo*, No. 10-0059, 2010 WL 3463316, at *3 (W.D. Pa. Sept. 1, 2010) (finding liability under both § 553 and the analogous 47 U.S.C. § 605 and proceeding under § 605).

[16] *Joe Hand Promotions, Inc. v. Wing Spot Chicken & Waffles, Inc.*, 920 F. Supp. 2d 659, 667 (E.D. Va. 2013) (applying the analogous § 605(e)(3)(C)(i)(II)).

First, nothing in the actual or statutory damages subsections, § 553(c)(3)(A)(i) and (ii),

suggests that deterrence is an appropriate decisional factor. Instead,

> according to the plain language of the statute, statutory damages are merely an
> alternative to actual damages. The statute creates no difference between the two.
> Thus, although it is possible to conclude that the statutory damages provision is
> intended to allow a court to impose greater damages than available under the
> actual damages provision, "the plain language offers no identified reason to reach
> that conclusion."

*Burdulis*, 460 F.3d at 181 (citing *Naranjo*, 303 F. Supp. 2d at 49).

Second, § 553's overall structure favors weighing deterrence under the enhanced

damages provision and not under the statutory damages provision. As the First Circuit Court of

Appeals explained in *Charter Communications Entertainment I, DST v. Burdulis*, 460 F.3d 168,

> Congress addressed the need for deterrence in other statutory provisions. Section
> 553(c)(2)(A), for example, allows a court to impose an injunction on defendants,
> thus preventing future violations. Congress similarly focused on deterrence in
> enacting § 553(c)(3)(B), which authorizes enhanced damages for certain willful
> conduct. With the existence of these separate provisions addressing deterrence,
> there was no need for Congress to ask courts to address the issue when
> determining statutory damages.

*Burdulis*, 460 F.3d at 183. The threat of criminal liability under § 553(b) for willful violations

also acts as both a general deterrent and a specific deterrent, as certain types of repeat offenders

face increasingly stiff penalties. *See* 47 U.S.C. § 553(b)(2). Section 553's language and structure

suggest no reason to assume that Congress expected courts to double count deterrence by

factoring it first into an actual or statutory damages award and then again into an enhanced

damages award. *See also, e.g.*, *J&J Sports Prods., Inc. v. Martinez*, No. 11-754, 2013 WL

2147790, at *8 (M.D.N.C. May 16, 2013) ("Plaintiff claims no other actual damages, aside from

costs and attorneys' fees, but rather points to speculative harm to Defendant La Hacienda Inc.'s

competitors and the need for deterrence of future violations, arguments better suited to the

determination of enhanced damages." (citation omitted)). The cases Joe Hand cites offer no convincing reasoning to the contrary.[17]

Joe Hand's invocation of deterrence depends in part on its view that "Congress has equated a violation of the statutes to theft of service." Br. 9. This perspective is misleading. While Congress enacted § 553 to combat cable piracy, *see infra* subsection III.A.2.c, the statute creates different penalties based on different mental states. Willful violations of § 553(a)(1)'s prohibition can subject violators to criminal penalties, 47 U.S.C. § 553(b), and additional, so-called "enhanced damages," *id.* § 553(c)(3)(B). By contrast, actual and statutory damages are awarded without any showing of *mens rea*, or even if the conduct is merely negligent.[18] Further,

---

[17] Regarding the cases Joe Hand cites: in advancing the deterrence rationale in its brief, Joe Hand does not distinguish between statutory and enhanced damages, and, in fact, cites mostly cases applying 47 U.S.C. § 605, *see* Br. 10-11, 14. But even assuming that § 553 can readily be substituted for § 605, the cases either apply deterrence under the enhanced damages paradigm, *see J&J Sports Prods., Inc. v. Marcaida*, No. 10-5125, 2011 WL 2149923, at *4 (N.D. Cal. May 31, 2011) ("[A]n award equal to three times the price Defendant would have had to pay to lawfully purchase the program is an appropriate sanction . . . for Defendant's *willful* violation of § 605." (emphasis added); *J&J Sports Prods., Inc. v. Castrillon*, No. 07-02946, 2009 WL 1033364, at *4 (E.D.N.Y. Apr. 16, 2009), offer little or no reasoning at all for why deterrence should be considered under the statutory damages paradigm, *see Joe Hand Promotions, Inc. v. Gamino*, No. 10-01544, 2011 WL 66144, at *3-4 (E.D. Cal. Jan. 10, 2011); *J&J Sports Prods., Inc. v. Cubides*, No. 08-0608, 2008 WL 2756401, at *2 (S.D. Tex. July 15, 2008) (awarding the maximum $10,000 statutory damages based largely on generic reasons—"the difficulty in detecting unlawful interception, the widespread problem of piracy, the projected loss to plaintiff, and the need for an award sufficient to deter future piracy by defendants and others"); *Joe Hand Promotions, Inc. v. RPM Mgmt. Co. LLC*, No. 09-0862, 2011 WL 1043574, at *4 (S.D. Ohio Mar. 18, 2011) (imposing ambiguous (and mysterious) "statutory damages in the amount of $20,000"), or do both, *see J&J Sports Prods., Inc. v. Braz. Paradise, LLC*, 789 F. Supp. 2d 669, 676-77 (D.S.C. 2011).

[18] *See, e.g., J&J Sports Prods. v. Coyne*, 857 F. Supp. 2d 909, 918 (N.D. Cal. 2012) ("Mr. Hernandez was clearly not aware that his acts constituted a violation of the law. Still, arguably he did not have 'no reason to believe' so. . . . [I]f Mr. Hernandez had read [his] contract [with Comcast], he would have had reason to believe that his acts might constitute a violation. Thus, the Court declines to reduce the damages from $250 to $100."); *cf. J&J Sports Prods., Inc. v. Nguyen*, No. 13-02008, 2014 WL 60014, at *4 (N.D. Cal. Jan. 7, 2014) ("[C]ourts have found violations of these statutes where defendants purchased the program through their satellite or cable provider, but thereafter exhibited the program in their commercial establishments without authorization from the exclusive licensee."). *See also infra* subsection III.A.2.a.

"[i]n any case where the court finds that the violator was not aware and had no reason to believe that his acts constituted a violation of this section, the court in its discretion may reduce the award of damages to a sum of not less than $100," *id.* § 553(c)(3)(C)—a sum which may be considerably less than what the court would otherwise have to impose. As a whole, § 553 plainly does not equate violation of § 553(a)(1) with piracy or theft. In fact, the deterrence rationale makes less sense with respect to negligent misconduct than intentional or willful misconduct, but statutory damages do not require intent or willfulness.

Finally, as the court pointed out in *Comcast of Massachusetts I, Inc. v. Naranjo*, 303 F. Supp. 2d 43, the consideration of deterrence in awarding statutory damages, "when carried through to its full implications, . . . leads to absurd results" because under that theory,

> an aggrieved party may receive as statutory damages premiums to deter future conduct in addition to actual or estimated actual damages. Statutory damages, however, may not exceed $10,000. As a result, parties that have suffered large actual damages (greater than $10,000) cannot receive any deterrence premiums. But if any violators require an additional deterrence premium, it is those who have caused the largest amounts of harm.

303 F. Supp. 2d at 49; *accord Burdulis*, 460 F.3d at 183.

For these reasons, the Court holds, in accordance with the *Naranjo–Burdulis* approach, that statutory damages under § 553(c)(3)(A)(ii) "should be calculated based solely on an estimate of actual damages," without considering deterrence. *Burdulis*, 460 F.3d at 181-83. This interpretation also "best satisfies the command of the statute and the judicial interest in promoting predictability and transparency." *Id.* at 181-82.

\* \* \*

Only one court appears to have acknowledged and disagreed with the *Naranjo–Burdulis* approach (other courts have simply not engaged in the legal analysis). In *Comcast of Illinois X, LLC. v. Toguchi*, No. 05-5363, 2008 WL 360682 (N.D. Ill. Feb. 11, 2008), the court criticized

*Naranjo*'s approach as ignoring the difference between the actual damages provision and the statutory damages provision, because, in the *Toguchi* court's words, "A plain reading of the statute demonstrates Congress's clear intent to provide courts with two different methods in which to calculate and award compensatory damages. It is our duty to enforce § 553 as it was written and not to change its meaning by adopting a different construction." *Id.* at *4.

      The concern is a valid one, but the *Naranjo–Burdulis* approach still represents the best interpretation of § 553's statutory damages, for the reasons discussed above. The *Toguchi* court assumes too much from the different language in the actual and statutory damages subsections. The statute's language and structure suggest that statutory damages are an alternative to actual damages because of the difficulty of *proving* actual damages, not so that the plaintiff can recover *more* than actual damages. Indeed, the actual damages provision requires the aggrieved party to "*prove* . . . the violator's gross revenue" from the violation, 47 U.S.C. § 553(c)(3)(A)(i) (emphasis added); the statutory damages option, of course, does not, *see id.* § 553(c)(3)(A)(ii). *See also* H.R. Rep. No. 98-934, at 85 (1984), *reprinted in* 1984 U.S.C.C.A.N. 4655, 4722 ("In determining the violator's profits, the party aggrieved shall have the burden of establishing the violator's gross revenues by the best means available, while the violator shall have the burden of proving any expenses he incurred which are normally deductible in determining profit, as well as any profit and revenues which are attributable to factors or activities other than the violation."). The statutory damages provision thus makes sense as authorizing courts to use their discretion to fashion factors to "estimate," rather than "comput[e]," § 553(c)(3)(A)(i), actual damages, *see, e.g.*, *Coxcom, Inc. v. Chaffee*, No. 05-0107, 2007 WL 1577708, at *3 (D.R.I. May 31, 2007), *aff'd*, 536 F.3d 101 (1st Cir. 2008), and can help to explain the cap of $10,000 "for all violations

involved in the action," 47 U.S.C. § 553(c)(3)(A)(ii); *see Nu-Tek*, 197 F.3d at 95, as a trade-off for demanding less proof.[19]

A broader concern, however, is that the *Toguchi* court's alternative, similar to the tack that many courts have pursued, leaves courts (and litigants) lost at sea. After criticizing the *Naranjo* rule, the *Toguchi* court turned to "a fact specific analysis." *Toguchi*, 2008 WL 360682, at *4. But while it indeed specified facts, the *Toguchi* court did not analyze how it reached its conclusion that $4000 would be a just award. *See id.*

Such "bottom line" approaches are common. Courts in a number of decisions have mixed and matched factors with little explanation of why those factors are relevant (or consistent with the *Naranjo–Burdulis* approach's rationale),[20] and in some cases, courts have chosen statutory

---

[19] The case law suggests the relevance of this distinction. For instance, the plaintiff may not have issued a rate card, thereby making post hoc licensing price calculation difficult, and the defendant may not have levied a cover charge because of the program, thereby making "profits of the violator that are attributable to the violation," 47 U.S.C. § 553(c)(3)(A)(i), difficult to calculate. But statutory damages would allow the court to proceed in its discretion by, for instance, multiplying the residential price of the programming by the number of patrons observed at the commercial establishment during the unlawful signal interception to obtain a rough estimate. Or, if the interception was by cable box in a residential setting, the court might take "the monthly charge for the premium cable service defendant was receiving illegally and subtract[] from it the amount defendant paid for basic cable service," and then add a figure for a "reasonable" number of "pay-per-view selections." *Charter Commc'ns Entm't I, LLC v. Burdulis*, 367 F. Supp. 2d 16, 27 (D. Mass. 2005), *aff'd* 460 F.3d 168; *see also Comcast Cable Commc'ns v. Bowers*, No. 06-1664, 2007 WL 1557510, at *3-4 (D.N.J. May 25, 2007). The point is that reading statutory damages as having the same aim as actual damages, but relaxing the standards of proof, not only accords with the language and structure of § 553, but also with the types of situations to which the statute must be applied. "Courts that opt to estimate actual damages must make several assumptions, including the value of the pay-per-view programming intercepted with the pirated device," *Bowers*, 2007 WL 1557510, at *4—and there is thus a good reason for having two different subsections, both of which have the same aim, and neither of which considers deterrence.

[20] *See, e.g.*, *J&J Sports Prods., Inc. v. Turrubiartes*, No. 11- 1496, 2013 WL 3878740, at *2 (S.D. Ind. July 26, 2013) ("[T]he Court imposes a statutory damages award of $5,000. The Court considers this award just in light of three factors: the size of the crowd (25–30 patrons), the lack of cover charge, and the single television exhibiting the fight."); *J&J Sports Prods., Inc. v. Aguilar*, No. 11- 1499, 2013 WL 3878897, at *2 (S.D. Ind. July 26, 2013) (same); *J&J Sports Prods. Inc. v. Miramontes*, No. 10-02345, 2011 WL 892350, at *2 (D. Ariz. Mar. 14, 2011)

damages figures after little more than a cursory survey of what a handful of other courts have done. Still other courts explicitly double-count the deterrence rationale by considering it in both the statutory damages and the enhanced damages inquiries, with no explanation of why doing so is appropriate;[21] one court, for example, found "five times the [broadcast cost]" an "appropriate" multiplier for arriving at a "base amount [that] is appropriate for the statutory violation."[22] These decisions may be partly the consequence of the nonadversarial nature of the adjudication of default judgment motions and their only rare exposure to appellate scrutiny.[23]

---

("[T]he establishment had 2 televisions and the total number of patrons at any given time were 8, 9, or 12. Given the relatively small impact of defendants' actions and the extremely low number of patrons in attendance, maximum statutory damages are not appropriate. If defendants had purchased the rights to show the broadcast it would have paid $1,400 (based on their 250 maximum capacity). Therefore, we find statutory damages in an amount double that, or $2,700, are appropriate."). One court even awarded damages outside the high end ($10,000) of the permissible statutory damage range. *See J&J Sports Prods., Inc. v. Alvarez*, No. 07-8852, 2009 WL 3096074, at *6 (S.D.N.Y. Sept. 25, 2009) ("I shall further assume that each patron purchased an average of $250 worth of food and drink as a result of his or her being in the Accused Premises while each Event was being intercepted. . . . Applying this methodology with respect to defendants' exhibition of the Event yields the following result: 50 patrons x $250/patron = $12,500.00." (47 U.S.C. § 605(e)(3)(C)(i)(II))).

[21] *See, e.g.*, *J&J Sports Prods., Inc. v. Edrington*, No. 10-3789, 2012 WL 525970, at *3 (D.N.J. Feb. 16, 2012) ("Courts in this District have awarded statutory damages in excess of actual damages for the purpose of deterrence."); *J&J Sports Prods., Inc. v. Lone Star Cafe & Pub*, No. 12-0764, 2013 WL 587662, at *2 (W.D. Wash. Feb. 14, 2013) ("The Court finds that an award of double the actual damages is appropriate."); *Kingvision Pay-Per-View, LTD v. Lardo*, No. 10-0059, 2010 WL 3463316, at *3 (W.D. Pa. Sept. 1, 2010) (awarding money far higher than the license fee as, inter alia, "enough to deter defendants and others like them from engaging in such conduct again"). One court even trebled the rate card under the statutory damages analysis and then trebled the resulting number again under the enhanced damages analysis. *See G&G Closed Circuit Events LLC v. Rivals Sports Grill LLC*, No. 12-3052, 2014 WL 198159, at *4 (W.D. La. Jan. 14, 2014).

[22] *Joe Hand Promotions v. Sorel*, 843 F. Supp. 2d 130, 135 (D. Mass. 2012) (a curious decision given *Burdulis*'s binding status in the First Circuit).

[23] Thus, the fact that Joe Hand can cherry-pick a handful of such decisions awarding such amounts as it would like here (or even that its lawyer, as the man behind much of this litigation all across the country, has managed to convince as many courts as he has to award relatively high statutory damages based on deterrence or other considerations irrelevant at this stage) is unmoving.

### b. Factors for measuring statutory damages

If the aim of statutory damages is to estimate actual damages, what factors are to be considered? The court should begin by asking what the defendant would have paid had he sought to obtain a lawful license. If the plaintiff issued a card listing rates for its programming (e.g., segmented by the capacity of the establishment), this number can be easily determined and can form the basis for the statutory damages award.[24] In cases without a rate card, courts have attempted to approximate a sublicense fee by estimating a per-patron charge and multiplying it by the number of patrons in the defendant commercial establishment.[25]

---

[24] *See, e.g.*, *Yakubets*, 2013 WL 5224123, at *4 & nn.6-7 (citing cases); *J&J Sports Prods., Inc. v. Moody*, No. 08- 5225, 2009 WL 1515749, at *2 (E.D. Pa. May 28, 2009) ("[W]e find that $1,200.00 is the proper amount of statutory damages . . . , as the rate for purchase of the Program would have been $1,200.00."); *Bowers*, 2007 WL 1557510, at *3 ("To calculate a 'just' award of statutory damages under § 553(c)(3)(A)(ii), most courts consider the value of the services to which the defendant had unauthorized access."); *Martinez*, 2013 WL 2147790, at *8; *Joe Hand Promotions, Inc. v. Canipe*, No. 12-00198, 2013 WL 1773741, at *5 (W.D.N.C. Apr. 25, 2013) (under § 605); *J&J Sports Prods., Inc. v. Ramos*, No. 12-086, 2012 WL 4514542, at *3-4 (E.D. Wash. Oct. 1, 2012) ("[T]he evidence only establishes the rate for this Defendant would have been $2200. . . . The court finds an award of $2200.00 in statutory damages appropriate."); *Joe Hand Promotions, Inc. v. Patton*, No. 10-40242, 2011 WL 6002475, at *3 (D. Mass. Nov. 29, 2011); *J&J Sports Prods., Inc., v. Gencarelli*, No. 10-4513, 2011 WL 1253886, at *3 (D.N.J. Mar. 28, 2011); *J&J Sports Prods., Inc. v. Chacko*, No. 13-1977, 2013 WL 6190603, at *4 (N.D. Ga. Nov. 25, 2013) (citing cases); *J&J Sports Prods., Inc. v. Bougie, Inc.*, No. 10-01374, 2011 WL 6202909, at *6 (E.D. Va. R&R Nov. 25, 2011), *adopted*, 2011 WL 6202898 (Dec. 12, 2011); *J&J Sports Prods., Inc. v. Wood*, No. 11-1160, 2011 WL 6961334, at *6 (N.D. Cal. R&R Nov. 2, 2011) (citing cases), *adopted*, 2012 WL 33258 (Jan. 6, 2012).

[25] *See generally, e.g.*, *Joe Hand Promotions, Inc. v. Parlavecchio*, No. 10-3294, 2011 WL 3859714, at *2 (C.D. Ill. Sept. 1, 2011) ("Courts generally use one of two approaches to calculate statutory damages. One approach is to award statutory damages based on the number of patrons in the establishment at the time of the unauthorized interception. The other approach is to award a flat sum based on the rate the provider charged to establishments, which varies by the maximum occupancy ranges." (citations omitted)). The rate card approach is preferred if it is available. *Accord J&J Sports Prods., Inc. v. Endzone Sports Bar, LLC*, No. 10-1370, 2011 WL 6151417, at *6 (E.D. Va. R&R Nov. 23, 2011) ("Because Plaintiffs['] sublicensing fee is based on the capacity of the venue, an award per customer would not be appropriate in this instance . . . ."), *adopted*, 2011 WL 6150597 (Dec. 8, 2011).

Second, the court might consider "any profits of the violator that are attributable to the violation which are not taken into account in computing the actual damages," one of the factors under the actual damages subsection, § 553(c)(3)(A)(i). (The *Naranjo* and *Burdulis* courts did not discuss whether profits should be added because they dealt with use of cable descramblers in residential settings. *See, e.g.*, *Burdulis*, 460 F.3d at 182-83 (passing on the question of "restitution").) Here, a court will necessarily have to exercise some discretion as to whether to award any further damages at all, for evidence of profits may be too speculative if the plaintiff cannot show that the profits "are attributable to the violation." 47 U.S.C. § 553(c)(3)(A)(i); *see, e.g.*, *Joe Hand Promotions, Inc. v. White*, No. 11-01331, 2011 WL 4406354, at *6 (N.D. Cal. R&R Aug. 2, 2011) ("[T]he Court recommends awarding Plaintiff $1,400.00 in statutory damages under 47 U.S.C. § 553(c)(3)(A)(ii) representing the $1,100.00 in actual losses based on the license fee, plus $300.00 to account for Defendants' additional possible profits from food and beverage sales."), *adopted*, 2011 WL 4406351 (Sept. 21, 2011); *J&J Sports Prods., Inc. v. Duong*, No. 13 -02002, 2014 WL 68904, at *4 (N.D. Cal. Jan. 8, 2014) ("As there is no evidence of how much Defendant made during the unlawful exhibition of the Program, the Court shall base statutory damages on the cost of the commercial license."). For instance, the court cannot estimate how many patrons came (and how much money they spent) because of the intercepted programming without any evidence of how many patrons come at similar times or what kinds of food and drink prices the establishment charges. Thus, in the absence of evidence, an estimate of profits should be a conservative figure that does not simply allow circumvention of the actual damages provision's proof requirement.

Factors to consider in estimating profits might include, for instance, (1) the size of the establishment; (2) the number of patrons at the establishment, taken, to the extent possible, as the number of patrons present because of the interception (to which evidence of advertising to attract

customers may be relevant); (3) the number, size, and position of screens displaying the broadcast (a factor to be considered in conjunction with (1) and (2) as an indication of who might be there specifically to watch); (4) any cover charge levied because of the interception; (5) what additional money patrons spent because of the interception (i.e., the amounts spent by those who otherwise would not have come, plus any other premiums or greater spending by those who would have come anyway); and (6) any such other factors as may appear relevant in the case before the court.[26]

### c. Estimating statutory damages in this case

The rate card in this case makes estimating actual damages straightforward as an initial matter. *See* Hand Aff., Ex. 1. Mr. Szlezak estimated that "[t]he capacity of [Café Nostalgie] is approximately 100 people," Szlezak Aff. 2, and the rate card and Mr. Hand's Affidavit establish that the "sublicense fee for the [Match] was based on the capacity of the establishment. . . . [I]f a commercial establishment had a maximum fire code occupancy of 100 persons, the commercial sublicense fee would have been $500.00." Hand Aff. ¶ 8. The Court therefore finds that Joe Hand is entitled to $500 as an estimate of actual damages.

Second, estimating Café Nostalgie's profits on account of its unlawful interception of the Match is difficult given the lack of evidence (due, in large part, to the Defendants' own default). As Joe Hand points out, "The capacity of Café Nostalgie was estimated to be 100." Br. 13 (citing Szlezak Aff. 3). There were between 44 and 48 patrons, according to Mr. Szlezak's headcounts over a two-hour period, and "the Program was displayed on four televisions, one 36" television and three 40" televisions." *Id.* (citing Szlezak Aff. 1-3). Further, the televisions seemed to project their coverage to most of the square footage of the bar: one television "was to the right as [Mr.

---

[26] Case law suggesting these factors, but in the context of enhanced damages, is included in the cases cited in note 44, *infra*.

Szlezak] entered, above the small bar"; another was to his "immediate left" in "the main area"; a third was "[b]ack in the left corner"; and the fourth was "[i]n the back right . . . booth area." Szlezak Aff. 1. There is no evidence of a cover charge or advertising for the show.

What the Court does not have, however, is any evidence of Café Nostalgie's prices or how many people are usually in the bar on a Saturday night. Even though Café Nostalgie and Mr. Yakubets defaulted, Joe Hand could have sent Mr. Szlezak or another investigator back on other nights at similar times to see how many patrons usually visit Café Nostalgie. In fact, during the two hours Mr. Szlezak spent at Café Nostalgie, he could have snapped a picture of the menu to establish prices or have talked with "Oksana the waitress," Szlezak Aff. 1, to ask how many people come on different nights and when such shows are broadcast. Such expectations should come as no surprise, given that the default judgment standard itself requires a plaintiff to offer proof of damages.[27]

Still, given Joe Hand's inability to take discovery, the Court will assume that (a) half of the individuals present came solely because of the show and (b) each spent $20 on food and drink, such that 24 * $20 = $480, and, further, that (c) the remaining half each spent $10 more than they otherwise would have because they stayed longer to watch the Match, or 24 * $10 = $240, for a total of $720. These are generous allowances given the lack of evidence; their foundation on revenue rather than profit; and the fact that without evidence of damages, courts often award only the sublicense fee from the rate card.[28] The inability to offer evidence of its expenses is, perhaps, how Café Nostalgie's default may be balanced to hurt it no less than Joe

---

[27] Further, Joe Hand would likely have been able to recoup such costs, if not as an appropriate factor under the statutory or enhanced damages provisions, then under § 553(c)(2)(C), which allows the court to "direct the recovery of full costs, including awarding reasonable attorneys' fees to an aggrieved party who prevails." 47 U.S.C. § 553(c)(2)(C).

[28] *See, e.g.*, *Duong*, 2014 WL 68904, at *4; *see also* cases cited in note 24, *supra*.

Hand, which consequently cannot take discovery. Nonetheless, these estimates seem reasonable, and Joe Hand offers no reasons to the contrary. August 21, 2010, was a Saturday, so perhaps less can be inferred from the presence of 48 individuals than if the interception had occurred on a Monday night, for example. But all the televisions, which, taken together, were visible in most, if not all, of Café Nostalgie's space, were playing the Match, thereby making it more likely that the patrons there were there to watch it.

For these reasons, the Court finds that as to statutory damages Joe Hand is entitled to the $500 it would have received had Café Nostalgie paid for a sublicense, plus an estimate of $720 in profits, for a total of $1220.

### 2. Enhanced Damages under § 553(c)(3)(B)

Congress "focused on deterrence in enacting § 553(c)(3)(B)," *Burdulis*, 460 F.3d at 183, which, by its plain terms, triggers the court's discretion to increase actual or statutory damages by up to $50,000 if the violation was committed (a) "willfully" and (b) "for purposes of commercial advantage or private financial gain," 47 U.S.C. § 553(c)(3)(B). *See Comcast of S. New Eng., Inc. v. Kacavas*, No. 07-10780, 2007 WL 4556685, at *2 (D. Mass. Dec. 18, 2007) ("Once [plaintiffs] have met those conditions, this Court has the discretion to impose increased damages.").

### a. Whether "the violation was committed willfully"

Though a familiar term, "willfully" bears "no fixed meaning," *United States v. Jenkins*, 275 F.3d 283, 287 n.3 (3d Cir. 2001) (quoting *Smith v. Wade*, 461 U.S. 30, 63 n. 3 (1983) (Rehnquist, J., dissenting)); its definition must be determined according to context, *id.* at 287 & n.3. *See also McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988) ("The word 'willful' is widely used in the law, and, although it has not by any means been given a perfectly consistent

interpretation, it is generally understood to refer to conduct that is not merely negligent. . . .").[29]

Neither the Supreme Court nor the Third Circuit Court of Appeals has interpreted what

"willfully" requires under either § 553(c)(3)(B) or its counterpart, 47 U.S.C. § 605(e)(3)(C)(ii),

but several factors suggest that § 553(c)(3)(B) requires at least both intent and either knowledge

or reckless disregard for whether the conduct violates § 553—that is, slightly more than the

intent, purpose, or deliberateness some courts have implied. For example, one court explained:

> Courts generally have been imprecise in assessing willfulness, often assuming it rather than finding it in any reasoned way. This tendency may be due to the nature of the violation: even garden-variety cable piracy (i.e., purchasing and hooking up an unauthorized device) could be considered willful because it requires affirmative illegal steps to be taken. As one court noted, "Signals do not descramble spontaneously, nor do television sets connect themselves to cable distribution systems." *Time Warner Cable of N.Y. City v. Googies Luncheonette, Inc.,* 77 F. Supp. 2d 485, 490-91 (S.D.N.Y. 1999). The Court agrees that, in the ordinary case, the act of acquiring and installing a descrambling device is sufficient to demonstrate a willful violation. *But there nonetheless must be a distinction between willful and non-willful violations, or the term "willful" has no meaning.*

*Burdulis*, 367 F. Supp. 2d at 29-30 (emphasis added) (citation and footnote omitted). The court

elaborated:

> [T]he statute necessarily proscribes other types of conduct that are not "willful," or the distinction is meaningless. An example of a possible non-willful violation would be a situation in which an adult child gave a descrambler to his unsophisticated elderly parent and told the parent that he was paying all relevant

---

[29] In the criminal law, where the word is also context-dependent, the jury must usually find that the defendant "acted with a purpose to disobey or disregard the law." 3d Cir. Model Jury Instr. 5.05 (Jan. 2014); *see also, e.g.*, *United States v. Murdock*, 290 U.S. 389, 394-95 (1933) ("The word ['willfully'] often denotes an act which is intentional, or knowing, or voluntary, as distinguished from accidental. But, when used in a criminal statute, it generally means an act done with a bad purpose; without justifiable excuse; [or] stubbornly, obstinately, perversely. The word is also employed to characterize a thing done without ground for believing it is lawful, or conduct marked by careless disregard whether or not one has the right so to act." (citing cases (citations omitted))). Although the civil and criminal contexts may demand "different standard[s]," *Brock v. Richland Shoe Co.*, 799 F.2d 80, 82 n.5 (3d Cir. 1986), *aff'd sub nom. McLaughlin v. Richland Shoe Co.*, 486 U.S. 128 (1988), civil standards are often just as demanding, as discussed above.

> charges to the cable company. The parent would thus be unlawfully receiving
> cable transmissions, but under circumstances that were not "willful."

*Id.* at 30 n.17.

Indeed, willfulness usually includes some specific intent element of knowledge or reckless disregard that the unlawful conduct is in fact forbidden by law. Under the Supreme Court's precedent, willfulness for civil enforcement actions under the Fair Labor Standards Act ("FLSA")—the standard that some courts have borrowed in interpreting § 553—requires that the defendant both acted intentionally as well as that it "either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute." *Richland Shoe Co.*, 486 U.S. at 133; *accord Pignataro v. Port Auth. of N.Y. & N.J.*, 593 F.3d 265, 273 (3d Cir. 2010) ("[Plaintiffs] must prove that the Port Authority knew it was violating the FLSA or acted in reckless disregard of whether it was violating the FLSA."). This knowledge or reckless disregard standard is, it should be clear, stricter than one requiring only negligence (e.g., one requiring that the defendant "acted without a reasonable basis for believing that it was complying with the statute," *Richland Shoe Co.*, 486 U.S. at 134 (citation omitted)). As the Third Circuit Court of Appeals has observed, "Despite th[e] allowable variation," in the meaning of "willfulness," "no court or commentator of whom we are aware has ever adopted so lax a definition of 'willfulness,' *in any other context*," *Brock v. Richland Shoe Co.*, 799 F.2d 80, 82 n.5 (3d Cir. 1986) (emphasis added), *aff'd sub nom. McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, that would demand only that the defendant "knew or suspected that his actions might violate" the statute, *id.* at 81 (quoting *Coleman v. Jiffy June Farms, Inc.*, 458 F.2d 1139, 1142 (5th Cir. 1971), *overruled*, *Richland Shoe Co.*, 486 U.S. 128)).

Several reasons suggest that § 553(c)(3)(B) requires intent and either knowledge of or reckless disregard for the illegality of the conduct, and not mere negligence. For one, because an

*unintentional* signal interception is quite unlikely, the various *mens rea* distinctions Congress

drew in § 553—among "willfully" in § 553(c)(3)(B), strict liability or negligence for actual or

statutory damages under § 553(c)(3)(A), and nonnegligence to qualify for damages reduction

under § 553(c)(3)(C)—would make little sense if not referring to what the defendant knew *about*

its violative conduct. If intentionality plus negligence sufficed to established willfulness, then

almost any violation (save for the sophisticated child–unsophisticated parent scenario) would be

willful. And if willfulness required mere intentionality, then even the sophisticated child–

unsophisticated parent scenario would present a tension between § 553(c)(3)(C)'s damage

reduction provision and § 553(c)(3)(B)'s damage enhancement provision. There is no reason to

read the statute this way, especially when most individuals will presumably understand their

actions to be unlawful.[30]

Second, § 553 also imposes criminal penalties for willful violation; in one of the criminal

provisions, the language is nearly identical to that of the enhanced damages provision. *Compare*

§ 553(b)(2) ("Any person who violates subsection (a)(1) of this section *willfully and for purposes*

*of commercial advantage or private financial gain* shall be fined . . . or imprisoned . . . ."

(emphasis added)), *with id.* § 553(c)(3)(B) ("In any case in which the court finds that the

violation was committed *willfully and for purposes of commercial advantage or private financial*

*gain*, the court in its discretion may increase the award of damages . . . ." (emphasis added)). The

criminal context favors a more stringent standard (i.e., of at least intentionality plus

recklessness). *Cf. Longview Ref. Co. v. Shore*, 554 F.2d 1006, 1012-14 (Temp. Emer. Ct. App.

---

[30] The "for purposes of commercial advantage or private financial gain" clause cannot serve
as the limiting factor that would permit this construction, because criminal liability may be
imposed even without any showing of "purposes of commercial advantage or private financial
gain." *Compare* 47 U.S.C. § 553(b)(1) ("Any person who willfully violates subsection (a)(1) of
this section shall be fined not more than $1,000 or imprisoned for not more than 6 months, or
both."), *with id.* § 553(b)(2) ("Any person who violates subsection (a)(1) of this section willfully
*and for purposes of commercial advantage or private financial gain* . . . ." (emphasis added)).

1977), *cited in Richland Shoe Co.*, 799 F.2d at 82 n.5. And finally, legislative history, to the extent that it is appropriate to consider, comports with this reading of "willfully."[31]

Thus, the Court concludes, willfulness for purposes of § 553(c)(3)(B)'s enhanced damages requires both the defendant's intentional signal interception as well as knowledge of or reckless disregard as to the unlawfulness of its signal interception.[32] And, as courts have consistently held in other contexts, such willfulness may be proved by circumstantial evidence. *See, e.g.*, *United States v. Johnstone*, 107 F.3d 200, 208 (3d Cir. 1997) (citing *Screws v. United States*, 325 U.S. 91, 107 (1945) ("And in determining whether that requisite bad purpose was present the jury would be entitled to consider all the attendant circumstances—the malice of

---

[31] The House Report explained, for instance, that

> [t]he Committee does not intend that manufacturers, distributors or retailers be subject to liability under this section if they are engaged in the production or sale of a device or equipment which is used for legal purposes merely because the same device or equipment is capable of being used for unauthorized reception of cable service, if they do not provide the equipment *with the intent or specific knowledge* that it will be used for the unauthorized reception of cable service.

H.R. Rep. No. 98-934, at 84, *reprinted in* 1984 U.S.C.C.A.N. at 4721 (emphasis added).

The context envisioned by the Committee in the foregoing passage is different than the one at issue here (and at issue in many cases), but Congress, in its brief description of § 553 in the Report, surely did not mean to set out the last word on all the ways of violating the statute. Congress did use the word "willfully" in what must be presumed to be the sense of "intentionally," without more, in one place in the Report. *See id.* at 85, *reprinted in* 1984 U.S.C.C.A.N. at 4722 ("Paragraph (3)(C) provides that in any civil action brought pursuant to this section the court in its discretion may reduce the award of any damages to not less than $100 if the court finds that *even though the violation was committed willfully or knowingly* the violator was not aware, and had no reason to believe, that his actions constituted a violation. . . ."). But given the overall context discussed in this Opinion, "willfully" is best interpreted as "intentionally" plus "knowledge" or "reckless disregard."

[32] The defendant need not know about or act with reckless disregard as to § 553. Rather, he need only know (or act with reckless disregard as to the possibility that) his actions are unlawful. *Cf.* H.R. Rep. No. 98-934, at 85, *reprinted in* 1984 U.S.C.C.A.N. at 4722 ("It is not relevant whether or not the violator was aware of or had any specific knowledge of the existence of this law." (discussing the damages reduction provision, § 553(c)(3)(C)); *cf. also, e.g.*, *United States v. Tsai*, 954 F.2d 155, 162 (3d Cir. 1992) ("If the defendant knew that the export was in violation of the law, we are hard pressed to say that it matters what the basis of that knowledge was.").

petitioners, the weapons used in the assault, its character and duration, the provocation, if any, and the like.")). This interpretation comports with the reading of the one court of appeals to have construed § 553's "willfully" in the civil context, *see Comcast of Ill. X v. Multi-Vision Elecs., Inc.*, 491 F.3d 938, 947 (8th Cir. 2007) (applying the FLSA standard and holding that "[w]illfulness is 'disregard for the governing statute and an indifference to its requirements'" and that it can be inferred (quoting *Trans World Airlines, Inc. v. Thurston,* 469 U.S. 111, 127 (1985))), as well as the appellate interpretations of willfulness under § 553's criminal provision[33] and the analogous civil provision in § 605.[34]

Applying this standard in the default judgment context, when there has been no discovery and likely little evidence, is difficult. Joe Hand argues, in essence, that willfulness should be presumed, given (a) the defendant's default and his concomitant failure to contest the issue and (b) the nature of the interception of encrypted cable programming. The default judgment standard demands more than just a passing glance: "Normally, for an interception to be found willful, there must be some factual specificity as to how defendants intercepted the signal." *Joe Hand Promotions, Inc. v. Patton*, No. 10-40242, 2011 WL 6002475, at *4 n.5 (D. Mass. Nov. 29, 2011). Thus, after *Twombly* and *Iqbal*, is the allegation that an "unauthorized interception . . . was done willfully," Compl. ¶ 20, sufficient, even if the Federal Rules of Civil Procedure permit "[m]alice, intent, knowledge, and other conditions of a person's mind [to] be alleged generally," Fed. R. Civ. P. 9(b); *see, e.g.*, *United Cable Television of E. San Fernando Valley, Ltd. v. Cruz*,

---

[33] *United States v. Gardner*, 860 F.2d 1391, 1395-97 (7th Cir. 1988) ("Given Gardner's obvious knowledge of the illegality of his sales to Perrin, as well as his demonstration of how to tap the illegal benefits of the black boxes during the October 7, 1985 sale to Perrin, we can only conclude that the evidence sufficiently established Gardner's specific intent to violate the law.").

[34] *ON/TV of Chi. v. Julien*, 763 F.2d 839, 844 (7th Cir. 1985) (following the Supreme Court's FLSA standard of "conduct showing 'disregard for the governing statute and an indifference for its requirements'" (quoting *Trans World Airlines*, 469 U.S. at 127)); *accord Cable/Home Commc'n Corp. v. Network Prods., Inc.*, 902 F.2d 829, 851-52 (11th Cir. 1990).

116 F.3d 488, at *1 (9th Cir. 1997) (table opinion) (context of §§ 553 and 605)? May willfulness be established by inference from the well-pleaded facts in the Complaint (and any other evidence adduced at the default judgment stage)?[35]

Ultimately, the answer to that question is yes, because of the particular nature of cable distribution systems, not because of the fact of default per se. A defendant's default itself is not relevant to a finding of willfulness (beyond requiring the admission of well-pleaded factual allegations); on its own, it does not support such an inference.[36]

What makes the inference of willfulness permissible, notwithstanding the lack of any more specific factual basis, is the particular nature of cable programming and the means to intercept it, combined with the knowledge of the average individual. As one court quotably put it, "Signals do not descramble spontaneously, nor do television sets connect themselves to cable distribution systems." *Googies Luncheonette*, 77 F. Supp. 2d at 490-91. In his Affidavit, Joe Hand, Jr. (Joe Hand's President), contends that Joe Hand's "programming is *not* and cannot be mistakenly, innocently or accidentally intercepted," and explains that it can be unlawfully

---

[35] *See also Patton*, 2011 WL 6002475, at *4.

[36] On this point, see the explanation of the District of Massachusetts Court in *Burdulis*, 367 F. Supp. 2d at 30. In essence, drawing an inference of willfulness from the defendant's default "places far too much weight on an event that is nearly always ambiguous. There are many reasons why a defendant might default in a civil case . . . ." *Id.* By comparison, such an inference may be permissible, or even compelling, where a defendant has invoked the Fifth Amendment. *E.g.*, *Joe Hand Promotions, Inc. v. Chios, Inc.*, --- F. App'x ---, ---, No. 12-20603, 2013 WL 5916799, at *1-2 (5th Cir. May 23, 2013).

Nonetheless, a number of courts have stated or implied that a defendant's default alone permits the inference that the violation was willful, or have accepted allegations of willfulness as admitted, even where they may have been conclusory and thus not entitled to being accepted as proven. *See Burdulis*, 367 F. Supp. 2d at 30 (citing cases); *see also, e.g.*, *J&J Sports Prods., Inc. v. Arboleda*, No. 09-0467, 2009 WL 3490859, at *5 (M.D. Fla. Oct. 27, 2009); *Joe Hand Promotions, Inc. v. Garcia*, 546 F. Supp. 2d 383, 385 (W.D. Tex. 2008); *J&J Sports Prods., Inc. v. Margaillan*, No. 13-0312, 2013 WL 6670356, at *5 (D. Ariz. Dec. 18, 2013); *Joe Hand Promotions, Inc. v. Parlavecchio*, No. 10-3294, 2011 WL 3859714, at *1 (C.D. Ill. Sept. 1, 2011).

intercepted by several means, including (1) the use of an unauthorized cable box that, when attached to a cable line, can descramble the programs without the providers' consent; (2) (purposeful) misrepresentation of a commercial establishment as a residential property to obtain residential rates; and (3) splicing a residential connection to the commercial establishment to obtain a residential rate. Hand Aff. ¶ 9.[37] And, indeed, a number of courts, often in the similar context of § 605, have subscribed to the view that "[i]t is difficult . . .  to see how Defendants could have accidentally intercepted and exhibited the encrypted Program; the signal had to be unscrambled by some deliberate act." *Joe Hand Promotions, Inc. v. McBroom*, No. 09-0276, 2009 WL 5031580, at *5 (M.D. Ga. Dec. 15, 2009).

The Court agrees, but with a caveat regarding Mr. Hand's exaggerated representation in his Affidavit. The chances of intercepting pay-per-view cable programming accidentally or innocently are slim, but they are not *nonexistent*, and thus courts should evaluate the circumstances on a case-by-case basis.[38] Because Mr. Hand's Affidavit and the relevant case law

---

[37] *See also* Hand Aff. ¶ 13 ("[S]uch actions . . . do not and cannot occur without the willful and intentional modification of electronic equipment, the willful and fraudulent misrepresentation of a commercial establishment as a residential one, the removal of cable traps or devices designed to prevent such unauthorized exhibits, or other willful and/or [intentional] acts purposely designed to obtain our programming unlawfully.").

[38] For one example, *see infra* subsection III.A.2.a. For another, and from a case that Joe Hand's counsel litigated: In *J&J Sports Productions v. Coyne*, 857 F. Supp. 2d 909 (N.D. Cal. 2012), "[t]he Double Play, a commercial establishment, purchased the Program from its Comcast account." *Id.* at 911. Double Play's owner, Mr. Hernandez, testified that he had no prior experience managing a bar and "did not know that he needed a special license to show fights in the bar." *Id.* After seeing a commercial for the fight, a bartender asked to show the fight, and Mr. Hernandez told the bartender to contact Comcast, which, when contacted, failed to "tell Double Play that it needed to contact J & J to purchase a commercial license for the Program." *Id.* At all times, Double Play represented itself "as a Comcast commercial customer." *Id.* If Mr. Hernandez knew he "was doing anything improper when [he] allowed [his] bartender to call Comcast to order the Program," he testified, he would not have shown the Program. *Id.* at 912.

When J&J argued that the court should award it enhanced damages under § 553(c)(3)(B), the court found that "there is not evidence here that the violation was committed willfully and for purposes of commercial advantage." *Coyne*, 857 F. Supp. 2d at 918. The court rejected J&J's

are in accord in that in *most* cases, "[i]n order for [the defendant] to [have] receive[d] the closed-circuit broadcast, it had to have engaged in some deliberate act, such as using an unauthorized decoder or altering the cable service in some way so as to receive and view the scrambled transmission," *Time Warner Cable of N.Y.C. v. Taco Rapido Rest.*, 988 F. Supp. 107, 111 (E.D.N.Y. 1997), the *inference* of *intentionality*, based on the remaining facts alleged in the complaint and offered by evidence, may be drawn. In other words, it is this nature of the technology at issue that permits a reasonable inference of *intentionality* to be drawn to substantiate what might otherwise be a conclusory allegation. *See also, e.g.*, *Joe Hand Promotions, Inc. v. Waldron*, No. 11-0849, 2013 WL 1007398, at *3 (D.N.J. Mar. 13, 2013) ("The Court credits Plaintiff's contention that it would be virtually impossible to receive this encrypted broadcast inadvertently; rather, the interception must have involved actions taken with the intent to receive the Broadcast through illicit means.").

The next question, however, is whether in addition to intentionality, the further knowledge of or recklessness with regard to the violation can be inferred. Some decisions have begged this question,[39] but apart from the formal imperfection of such logic, the overall approach

---

argument that Mr. Hernandez's action was willful because he "was unsure of whether he could order the fight, and did not take action to find out whether the action was lawful," and instead held that these facts did "not give rise to a 'willful' violation." *Id.*

*Coyne* also helpfully illustrates the degrees of culpability contemplated by § 553. Although Mr. Hernandez's conduct was not willful because it was not intentional or reckless with regard to the violation, it was negligent. "[I]f Mr. Hernandez had read the contract, he would have had reason to believe that his acts might constitute a violation." *Coyne*, 857 F.2d at 918. For this reason, the court declined to reduce damages under § 553(c)(3)(C), thereby leaving J&J with statutory damages.

[39] *E.g.*, *Joe Hand Promotions, Inc. v. Becchetti*, No. 12-1242, 2013 WL 4520638, at *4 (M.D. Pa. Aug. 26, 2013) ("As to the willful element, courts have generally found that the act of pirating itself sufficiently evidences intent because the viewer can only access the program by unscrambling an encrypted signal, something that is virtually impossible to do accidentally." (people know that "piracy" is illegal)).

is justified when articulated.[40] "[W]ithout a full factual record, . . . further analysis [is] difficult," *Patton*, 2011 WL 6002475, at *4, and the decision is a close one. Still, it is hard to believe that a defendant who acts intentionally to intercept cable programming unlawfully does not know the illegality of his actions (or at least recklessly disregards the distinct possibility of unlawfulness). The recognition of the intentional, unauthorized interception of programming as theft is probably within the ken of the average individual.[41] Thus, the Court holds that the likelihood of a violation's being intentional and, further, its likelihood of being knowingly illegal, suffices to establish a presumption of willfulness for the purposes of pleading, and, thus, default judgment.[42]

In this case, Joe Hand has alleged that the "unauthorized interception . . . was done willfully." Compl. ¶ 20. Because accidental interception of the Match was highly unlikely—such an accident would have had to affect all four of the televisions set up in different areas throughout Café Nostalgie and all of which were showing the Match. Szlezak Aff. 1. The Court

---

[40] *See, e.g.*, *Joe Hand Promotions, Inc. v. Garcia*, 546 F. Supp. 2d 383, 385 (W.D. Tex. 2008) ("[B]ecause of the unlikelihood of Defendant accidentally acquiring and displaying the scrambled pay-per-view signal, Defendant's failure to file an answer amounts to an admission that its activity constituted a willful violation of statutory law."); *Entm't by J&J, Inc. v. Al-Waha Enters., Inc.*, 219 F. Supp. 2d 769, 776 (S.D. Tex. 2002) ("Based on the limited methods of intercepting closed circuit broadcasting of pay-per-view events and the low probability that a commercial establishment could intercept such a broadcast merely by chance, however, courts have held conduct such as that . . . in this case to be willful . . . .").

[41] Of course, one might then wonder why Congress used a willfulness instead of an intent requirement, but, as noted above, in the case of actual accidents, however rare (or bona fide uninformed defendants), Congress may have wanted such defendants to be able to raise a good faith defense, however unlikely it might be.

[42] But only that much—a presumption. The Court is not prepared to say that the presumption could not be rebutted in appropriate circumstances and as the procedural posture would allow. *See, e.g.*, *supra* note 38. Moreover, this holding is context-specific to § 553. Generally speaking, bare allegations and a defendant's default should not permit the inference of willfulness, and whether Joe Hand's "argument will suffice in different circumstances is a question for another day." *Patton*, 2011 WL 6002475, at *4; *cf. Burdulis*, 367 F. Supp. 2d at 30-31 (applying the same reasoning in the context of the purchase and installation of a descrambler).

thus finds, for present purposes, that the interception was intentional. And, finally, for the reasons discussed above, the Court will accept for now that the violation was willful.

### b. Whether "the violation was committed . . . for purposes of commercial advantage or private financial gain"

To award the plaintiff enhanced damages, the court must also find that the defendant acted "for purposes of commercial advantage or private financial gain." 47 U.S.C. § 553(c)(3)(B). The courts of appeals have not addressed the meaning of this requirement, but it would seem to be satisfied by a broad set of circumstances. *Cf. Cablevision Sys. N.Y.C. Corp. v. Lokshin*, 980 F. Supp. 107, 114-15 (E.D.N.Y. 1997) (discussing a difference between § 553(c)(3)(B) and the analogous provision in § 605 that establishes a particular way in which § 553(c)(3)(B) is broader); *Burdulis*, 367 F. Supp. 2d at 31-32 (same, and relying on *Lokshin*).

In this case, the Complaint establishes that Café Nostalgie is a commercial establishment, and Mr. Szlezak's Affidavit establishes that Café Nostalgie contains a bar area for ordering drinks, "an area made to look like the outside of a restaurant with outdoor seating," and four televisions. Szlezak Aff. 1. As Mr. Hand opines in his Affidavit, often "the very purpose of pirating . . . programming" is "to lure or retain patrons who seek to be entertained by [it]." Hand Aff. ¶ 17. From Café Nostalgie's four televisions all showing the Match, the Court can infer such a purpose here. *See also* Hand Aff. ¶ 18. "Because the intercepted signal was shown at a restaurant as an inducement for patrons to purchase food and beverages, the Court has no difficulty finding that the violation was made for the[] purposes . . . 'of commercial advantage or private financial gain.'" *Patton*, 2011 WL 6002475, at *4; *see also, e.g.*, *Waldron*, 2013 WL 1007398, at *3 ("[B]ecause Defendants displayed the Broadcast at their place of business, the Court may infer that Defendants' conduct was 'for the purposes of direct or indirect commercial

advantage or indirect pecuniary gain' . . . ."); *Joe Hand Promotions, Inc. v. Canipe*, No. 12-0198, 2013 WL 1773741, at *4 (W.D.N.C. Apr. 25, 2013) (same reasoning).

### c.   Measure of enhanced damages

Courts have adopted a variety of approaches for deciding how much to award in enhanced damages. Some courts, with little more than a brief survey of other decisions, have granted awards that "appear[] to be somewhat arbitrary and, for the most part, not based on any specific articulated factors." *Burdulis*, 367 F. Supp. 2d at 33.[43] Other courts, still "approach[ing] the enhanced damages analysis in a more cursory manner" employ a multiplier to the statutory damages award. *Waldron*, 2013 WL 1007398, at *8 (citing cases). Many courts look deeper through multifactor tests,[44] some of which balance "[t]he need for deterrence . . . against the harm to the defendant's business if significant damages are assessed."[45]

---

[43] It is unclear how much analysis, or what kind of statement of reasons, is required. *Cf. Nat'l Satellite Sports, Inc. v. Eliadis, Inc.*, 253 F.3d 900, 918 (6th Cir. 2001) ("Although the district court did not specify precisely how it arrived at the final figure of $4,500, we conclude that the proof supports the damage calculation, that the amount is well within the statutory range, and that the award is not clearly erroneous." (statutory damages under § 605)). But even if "there are few bright line rules governing [a court's] discretion to award enhanced damages under either" § 553 or § 605, *Waldron*, 2013 WL 1007398, at *7, arbitrary amounts of damages would seem more likely to result when courts decline to channel their discretion through explicit reasons or factors. The nonadversarial default judgment context further warrants such judicial discipline.

[44] *See, e.g.*, *Waldron*, 2013 WL 1007398, at *7 (laying out a five-factor test and citing *Kingvision Pay-Per-View Ltd. v. Rodriguez*, No. 02-7972, 2003 WL 548891, at *2 (S.D.N.Y. Feb. 25, 2003) (§ 605 context)); *see also, e.g.*, *J&J Sports Prods., Inc. v. Gencarelli*, No. 10-4375, 2012 WL 4442514, at *2-3 (D.N.J. Sept. 21, 2012) (§ 605); *J&J Sports Prods., Inc. v. Hot Shots, Inc.*, No. 09-1884, 2010 WL 3522809, at *2 (E.D.N.Y. R&R Apr. 27, 2010) (§ 605), *adopted*, 2010 WL 3523003 (Sept. 2, 2010); *J&J Sports Prods., Inc. v. Stone*, No. 13-0936, 2013 WL 5169667, at *1 (D. Ariz. Sept. 13, 2013) (eight factors in the § 605 context).

[45] *J&J Sports Prods. Inc. v. Guzman*, No. 12-0525, 2012 WL 3108831, at *1 (D. Ariz. July 31, 2012) (citing *Kingvision Pay-Per-View Ltd. v. Lake Alice Bar*, 168 F.3d 347, 350 (9th Cir. 1999) ("The range in the statutory award might allow for a sanction that deters but does not destroy.")); *see also, e.g.*, *J&J Sports Prods., Inc. v. Wing Bistro LLC*, No. 13-0031, 2013 WL 6834645, at *9 (E.D. Va. Dec. 19, 2013) (§ 605).

Having recognized the disgorgement of profits as an appropriate consideration under the statutory damages inquiry, *see* text accompanying note 26, this Court will take a different approach and focus on the language and apparent aims of § 553's enhanced damages provision. Although they are triggering factors, willfulness and "commercial advantage or private financial gain," 47 U.S.C. § 553(c)(3)(B), together with the statute's legislative history and the foregoing analysis of § 553's structure, suggest that the primary concern with the imposition of enhanced damages is deterrence. The factors a court should consider in order to produce a sensible enhancement of the actual or statutory damages award, then, should likewise target deterrence.

First, "Congress enacted § 553 specifically to combat the novel phenomenon of cable piracy," and "[t]he legislative history to the Cable Act supports th[e] interpretation" that Congress "created strict new penalties to deter cable pirates who would otherwise exploit this phenomenon." *TKR Cable Co.*, 267 F.3d at 203-04; *accord Prostar v. Massachi*, 239 F.3d 669, 673 (5th Cir. 2001) ("[O]ne of Congress's principal objectives was to discourage theft of cable services. . . ."); H.R. Rep. No. 98-934, at 83, *reprinted in* 1984 U.S.C.C.A.N. at 4720 ("The Committee is extremely concerned with a problem which is increasingly plaguing the cable industry—the theft of cable service. . . ."). Accordingly, Congress appears to have been concerned not just with the fact that "[t]heft of services is depriving the cable industry of millions of dollars of revenue each year," but also that such theft "creates an unfair burden on cable subscribers who are forced to subsidize the benefits that other individuals are getting by receiving cable service without paying for it." H.R. Rep. No. 98-934, at 83, *reprinted in* 1984 U.S.C.C.A.N. at 4720. Because willful violations of § 553 constitute theft,[46] the legislative

---

[46] For the reasons discussed earlier, however, the Court rejects Joe Hand's argument that "Congress has equated a violation of the statutes to theft of service." Br. 9. If the violation was in fact willful, it was theft, but Congress contemplated nonwillful violations by, inter alia, making the statute strict liability, providing for enhanced damages for willful violations, and creating an

history suggests that the deterrence rationale is the central driver of enhanced damages. "An additional award for willfulness will put violators 'on notice that it costs less to obey the . . . laws than to violate them.'" *Googies Luncheonette*, 77 F. Supp. 2d at 491 (quoting *Rodgers v. Eighty Four Lumber Co.*, 623 F. Supp. 889, 892 (W.D. Pa. 1985) (violation of copyright laws)); *see also, e.g.*, *J&J Sports Prods., Inc. v. Castrillon*, No. 07-02946, 2009 WL 1033364, at *3 (E.D.N.Y. Apr. 16, 2009) ("Absent substantial financial penalties, the defendant will likely continue to illegally display the plaintiff's programming and other such establishments will follow suit. The plaintiff cannot practicably investigate all these infractions, nor should they be expected to do so." (citation omitted)).

Second, the "commercial advantage or private financial gain" prong suggests some consideration at the enhanced damages stage of whether and how the defendant profited from its violation. But if—as this Court views as the correct method of interpreting § 553—a court has awarded profits made on account of the violation under the actual or statutory damages rubric, there is no reason to perform that analysis again under the enhanced damages provision. Further, another element in the statute's structure suggests that specific deterrence also impels the "commercial advantage or private financial gain" inquiry. Section 553's criminal penalties for willful violation—a fine of up to $1000 and/or up to six months' imprisonment, 47 U.S.C. § 553(b)(1)—rise steeply if the defendant also acts "for purposes of commercial advantage or private gain" to a fine of up to $50,000 and/or up to two years' imprisonment for the first violation and up to $100,000 and/or five years' imprisonment "for any subsequent offense," *id.* § 553(b)(2).

---

exception for cases in which "the court finds that the violator was not aware and had no reason to believe that his acts constituted a violation of this section," 47 U.S.C. § 553(c)(3)(C). *See supra* notes 17–18 and accompanying text.

These considerations suggest that the Court should look to factors relevant to deterrence to determine how to enhance statutory damages. The application to the actual or statutory damages award of a simple multiplier, the value of which may be adjusted as the case demands, best achieves the dual goals of general and specific deterrence. Indeed, courts applying multipliers "have awarded anywhere from three to six times the statutory damages award for enhanced damages." *J&J Sports Prods., Inc. v. Ribeiro*, 562 F. Supp. 2d 498, 502 (S.D.N.Y. 2008). The use of a multiplier both vindicates Congress's interest in generally deterring theft of cable services (as reflected in the "willfully" requirement), as well as addresses § 553(c)(3)(B)'s "commercial advantage or private financial gain" prerequisite by forcing the defendant to disgorge a multiple of its profits (and thus also specifically deters). A multiplier also addresses "the difficulty in detecting the unlawful acquisition of the broadcast" and "the widespread loss that occurs through pirating license transmissions," *J&J Sports Prods., Inc. v. Stone*, No. 13-0936, 2013 WL 5169667, at *1 (D. Ariz. Sept. 13, 2013) (§ 605 context), concerns would seem to be present in every case and that should not provide the basis for a separate, specific-deterrence consideration.

The main case-specific (and thus specific deterrence) factor—although the Court will not attempt to foreclose the consideration of other factors in an appropriate case—is whether, and to what extent, the defendant is a repeat violator.[47] The enhanced damages provision itself may be read as endorsing a formulaic approach—"the court in its discretion may *increase the award of damages*, whether actual or statutory." 47 U.S.C. § 553(c)(3)(B) (emphasis added). Further, the

---

[47] Whether the defendant is a repeat violator is a first-listed factor in a number of formulations of multifactor standards. *See, e.g.*, *Waldron*, 2013 WL 1007398, at *7-8; *J&J Sports Prods., Inc. v. Wing Bistro LLC*, No. 13-0031, 2013 WL 6834645, at *9 (E.D. Va. Dec. 19, 2013) (§ 605); *J&J Sports Prods. Inc. v. Guzman*, No. 12-0525, 2012 WL 3108831, at *1 (D. Ariz. July 31, 2012); *J&J Sports Prods., Inc. v. Hot Shots, Inc.*, No. 09-1884, 2010 WL 3522809, at *2 (E.D.N.Y. R&R Apr. 27, 2010) (§ 605), *adopted*, 2010 WL 3523003 (Sept. 2, 2010).

criminal provision states that "the prohibited activity . . . as it applies to each such device shall be deemed a separate violation," *id.* § 553(b)(3), thereby creating a multiplier of penalties under the enhanced criminal provision, which allows a fine of up to $100,000 and/or five years "for any subsequent offense," *id.* § 553(b)(2).

In this case, there is no allegation or evidence that Café Nostalgie or Victor Yakubets is a repeat violator. And if either is "the Blackbeard of pirates, [Joe Hand] makes no attempt to portray it as such, and to the contrary, the act of piracy attributed to" them would seem to be "as routine as they come." *Joe Hand Promotions, Inc. v. Streshly*, 655 F. Supp. 2d 1136, 1139 (S.D. Cal. 2009). The Court thus concludes that a minimum multiplier of three is appropriate and will award Joe Hand treble statutory damages as enhanced damages, for an additional award of $3660 under § 553(c)(3)(B).[48]

### B. Individual Vicarious Liability under 47 U.S.C. § 553

The final issue is whether Mr. Yakubets may be held vicariously and therefore jointly liable for the violation of § 553. Conceding that "an additional layer of analysis is required," Joe Hand argues that "[f]or an individual to be liable for piracy, Plaintiff must demonstrate that the defendant had 'a right and ability to supervise the violations and that he had a strong financial

---

[48] A number of courts have used three as a baseline multiplier. *E.g.*, *Joe Hand Promotions, Inc. v. ADJ Entity, LLC*, No. 11-0090, 2011 WL 4102314, at *5 (M.D. Ga. Sept. 14, 2011) ("For first-known violations of the statutes, courts in our circuit have awarded enhanced damages of three times what it would have cost Defendants to lawfully exhibit the Program." (§§ 553 and 605)); *DIRECTV, Inc. v. Cibulka*, No. 11-0231, 2011 WL 3273058, at *1 n.4 (M.D. Pa. July 29, 2011) (§ 605); *Entm't by J&J, Inc. v. Al-Waha Enters., Inc.*, 219 F. Supp. 2d 769, 776-77 (S.D. Tex. 2002); *Joe Hand Promotions, Inc. v. Parlavecchio*, No. 10-3294, 2011 WL 3859714, at *2 (C.D. Ill. Sept. 1, 2011) (§ 605). In fact, even the court in *Kingvision Pay-Per-View, LTD v. Lardo*, No. 10-0059, 2010 WL 3463316 (W.D. Pa. Sept. 1, 2010), which Joe Hand cites because of the award of $9000 in enhanced damages, calculated enhanced damages under § 605 by trebling its award of statutory damages. *Id.* at *4; *see* Br. 12. (The Court disagrees with the *Lardo* court's statutory damages methodology, at least as applied to § 553. *See supra* note 21.)

interest in such activities.'" Br. 6 (quoting *J&J Sports Prods., Inc. v. J.R. 'Z Neighborhood Sports Grille, Inc.*, No. 09-3141, 2010 WL 1838432, at *2 (D.S.C. R&R Apr. 5, 2010) (citation and alteration omitted), *adopted*, 2010 WL 1838428 (May 6, 2010)). Mr. Yakubets meets this standard, Joe Hand contends, because he "was an individual with a 'right and ability to supervise' the violations and a strong financial interest in the violation." Br. 6-7.

Courts have expressed some skepticism about the applicability of the standard Joe Hand advocates, with regard to both (1) whether and (2) if so, how, to apply it. There is no question that an individual can be held jointly liable with his corporation. "The fact that an officer is acting for a corporation also may make the corporation vicariously or secondarily liable under the doctrine of respondeat superior; it does not however relieve the individual of his responsibility." *Donsco, Inc. v. Casper Corp.*, 587 F.2d 602, 606 (3d Cir. 1978) (citing *Zubik v. Zubik*, 384 F.2d 267, 275 (3d Cir. 1967)); *e.g.*, *Mead Johnson & Co. v. Baby's Formula Serv., Inc.*, 402 F.2d 19, 23 (5th Cir. 1968) ("The fact that the persons thus acting are acting for a corporation also, of course, may make the corporation liable under the doctrine of respondeat superior."). In *Zubik v. Zubik*, 384 F.2d 267, the Third Circuit Court of Appeals explained:

> The general, if not universal, rule is that an officer of a corporation who takes part in the commission of a tort by the corporation is personally liable therefor; but that an officer of a corporation who takes no part in the commission of the tort committed by the corporation is not personally liable to third persons for such a tort, nor for the acts of other agents, officers or employees of the corporation in committing it, unless he specifically directed the particular act to be done, or participated therein.

*Id.* at 275 (citation omitted); *accord Chanel, Inc. v. It. Activewear of Fl., Inc.*, 931 F.2d 1472, 1477-78 (11th Cir. 1991) (" [A] corporation can act only through individuals. . . . If an individual actively and knowingly caused the infringement, he is personally liable. . . .").

Presumably because Joe Hand cannot say for certain that Mr. Yaubets himself participated in the § 553 violation, Joe Hand contends, in essence, that Mr. Yakubets is vicariously liable.

### 1.  The Standard for Individual Vicarious Liability under 47 U.S.C. § 553

### a.  Whether the *Softel* standard applies to the § 553 context

Neither the Supreme Court nor any of the courts of appeals has addressed the issue of vicarious liability under § 553.[49] The standard Joe Hand offers—a "right and ability to supervise" plus a direct financial interest in the conduct—has its origin in the Second Circuit Court of Appeals' decision in the copyright context in *Softel, Inc. v. Dragon Medical & Scientific Communications, Inc.*, 118 F.3d 955 (2d Cir. 1997).[50] The *Softel* court stated:

> To establish vicarious liability, Softel was required to show that [Mr.] Hodge had a "right and ability to supervise [that] coalesce[d] with an obvious and direct financial interest in the exploitation of copyrighted materials." *Shapiro, Bernstein & Co. v. H.L. Green Co.*, 316 F.2d 304, 307 (2d Cir. 1963). The only evidence that Softel adduced prior to the court's ruling relating to the issue of Hodge's supervisory capacities and financial interests was that Hodge was the president of Dragon and a shareholder. The evidence is too attenuated to establish a sufficiently "direct" financial interest in the exploitation of copyrighted materials. *Cf. id.* at 308 (finding appellee vicariously liable because, *inter alia*, it received 10%–12% of the sales of the infringing materials).

*Softel*, 118 F.3d at 971-72 (alterations in original) (emphases added).

One can consider the wisdom of importing the *Softel* test into the § 553 context. Several district courts have stated that they are "not convinced that the test for vicarious liability under the Copyright Act should be extended to [§ 553]" especially where the plaintiff did "not address

---

[49] *See* the discussion of the Eighth Circuit Court of Appeals' decision, *infra* note 51.

[50] As the block quote from *Softel* suggests, *Softel* did not announce a new standard, but, as explained in *J&J Sports Production v. Flores*, 913 F. Supp. 2d 950 (E.D. Cal. 2012), courts interpreting § 605 borrowed the standard from *Softel*, *id.* at 955. For this reason, the Court refers to copyright law's vicarious liability standard as the *Softel* test.

the important distinction that the Copyright Act and [§ 553] are different statutes" that may not share "a common legislative history."[51]

The Court does not perceive these concerns as impediments to borrowing the *Softel* test, for two primary reasons. First, the Supreme Court has noted that "[a]lthough '[t]he Copyright Act does not expressly render anyone liable for infringement committed by another,' these

---

[51] *J&J Sports Prods., Inc. v. Torres*, No. 09-0391, 2009 WL 1774268, at *4 (M.D. Fla. June 22, 2009); *see also, e.g.*, *Joe Hand Promotions, Inc. v. Wright*, No. 13-0615, 2013 WL 4537065, at *2-3 (D.D.C. Aug. 28, 2013) (expressing concern about the application of the *Softel* standard and stating, "Rather than wade in to what appears to be a question of first impression in this Circuit, the Court finds that the more sensible approach is to grant Plaintiff leave to amend its Complaint."); *J&J Sports Prods., Inc. v. Resendiz*, No. 08-4121, 2009 WL 1953154, at *2 n.1 (N.D. Ill. July 2, 2009) ("[W]e are skeptical that the doctrine of vicarious liability should be extended to broadcast piracy actions.").

In *Joe Hand Promotions, Inc. v. Sharp*, 885 F. Supp. 2d 953 (D. Minn. 2012), another district court, after expressing skepticism, decided not to apply the *Softel* standard in favor of what it perceived as binding circuit precedent. *Id.* at 955-56. The *Sharp* court noted that in *Comcast of Illinois X v. Multi–Vision Electronics, Inc.*, 491 F.3d 938 (8th Cir. 2007), the Eighth Circuit had upheld the imposition of individual liability under § 553 against Mr. Abboud for the distribution of "cable descramblers used to steal the plaintiff's cable signal," *Sharp*, 885 F. Supp. 2d at 956, "[b]ecause the record shows no distinction between Abboud's actions and Multivision's [(the company)]," *Comcast of Ill. X*, 491 F.3d at 947-48. The *Sharp* court then reasoned that "[t]he Eighth Circuit, therefore, applied an individual-liability standard different from both 'veil piercing' and 'benefit and control'" (the latter phrasing being the equivalent of the *Softel* standard). Thus, the *Sharp* court explained, the plaintiff need not "necessarily establish that an individual defendant had a 'strong financial interest' in the allegedly unlawful conduct, as in the benefit-and-control test," but, "[r]ather, to impose individual liability under the FCA, a plaintiff must show that there exists 'no distinction' between the individual's actions and that of his corporation." 885 F. Supp. 2d at 956 (quoting *Comcast of Ill. X*, 491 F.3d at 947).

But this conclusion does not necessarily follow from the Eighth Circuit's rule in *Comcast of Illinois X*. That court's brief discussion appeared not to set down or endorse a *vicarious liability* theory, but rather a theory of individual liability based on the individual defendant's actions as a wrongdoer—that is, a *personal liability* standard much like the Third Circuit Court of Appeal's formulation in *Zubik* or *Donsco, Inc. v. Casper Corp.*, 587 F.2d 602. The Eighth Circuit Court of Appeals' reasoning was that "the record shows no distinction between Abboud's actions and Multivision's," such that Mr. Abboud was "personally liable." *Comcast of Ill. X*, 491 F.3d at 947. The rule it was applying, then, must have been that "[a] corporate officer is individually liable for the torts he personally commits and cannot shield himself behind a corporation when he is an actual participant in the tort," *Donsco*, 587 F.2d at 606—that is, his liability, in such a case, is personal, not vicarious. (The *Sharp* court went on to conclude that, in any case, it "would reach the same result," that Mr. Sharp could not be held personally liable, under the *Softel* standard. 885 F. Supp. 2d at 957.)

doctrines of secondary liability [(vicarious and contributory)] *emerged from common law principles and are well established in the law*." *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 930-31 (2005) (emphasis added) (quoting *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 434 (1984)); *see also Sony Corp.*, 464 U.S. at 435 ("The absence of such express language in the copyright statute does not preclude the imposition of liability for copyright infringements on certain parties who have not themselves engaged in the infringing activity. *For vicarious liability is imposed in virtually all areas of the law . . . .*" (emphasis added)); *Shapiro*, 316 F.2d at 307 (reasoning that vicarious liability should apply in the copyright context because, inter alia, "[i]t is quite clear . . . that the normal agency rule of respondeat superior applies to copyright infringement by a servant within the scope of his employment," and "[r]ealistically, the courts have not drawn a rigid line between the strict cases of agency, and those of independent contract, license, and lease" (citing *M. Witmark & Sons v. Calloway*, 22 F.2d 412, 414 (E.D. Tenn. 1927)); *M. Witmark & Sons*, 22 F.2d at 414 ("The rule of the common law applies, to wit, that the master is civilly liable in damages for the wrongful act of his servant in the transaction of the business which he was employed to do, although the particular act may have been done without express authority from the master, or even against his orders."). The application of the *Softel* test is therefore not so much an extension of copyright law into the § 553 context, but rather the borrowing of a well-developed doctrine, i.e., vicarious liability, based on common legal principles.

Second, the copyright statute is not in fact so different from § 553. The general copyright infringement statute bears a striking resemblance to § 553 and also provides for actual damages, statutory damages, enhanced damages for willful infringement, and reduced damages for accidental, nonnegligent infringement, and does so with a similar structure and similar wording.

*See* 17 U.S.C. § 504(b), (c).[52] The Court will therefore apply the standard reiterated in *Softel* as

an appropriate test for assessing vicarious liability under 47 U.S.C. § 553.

### b.  The substance of the *Softel* standard

Even when accepting or assuming that the *Softel* standard applies, courts demonstrate

differing views as to what the *Softel* standard requires. Under the first prong, the defendant must

---

[52] The copyright statute provides, in relevant part:

**(a) In General.—**Except as otherwise provided by this title, an infringer of copyright is liable for either—

**(1)** the copyright owner's actual damages and any additional profits of the infringer, as provided by subsection (b); or

(2) statutory damages, as provided by subsection (c).

**(b) Actual Damages and Profits.—**The copyright owner is entitled to recover the actual damages suffered by him or her as a result of the infringement, and any profits of the infringer that are attributable to the infringement and are not taken into account in computing the actual damages. In establishing the infringer's profits, the copyright owner is required to present proof only of the infringer's gross revenue, and the infringer is required to prove his or her deductible expenses and the elements of profit attributable to factors other than the copyrighted work.

**(c) Statutory Damages.—**

**(1)** Except as provided by clause (2) of this subsection, the copyright owner may elect, at any time before final judgment is rendered, to recover, instead of actual damages and profits, an award of statutory damages for all infringements involved in the action, with respect to any one work, for which any one infringer is liable individually, or for which any two or more infringers are liable jointly and severally, in a sum of not less than $750 or more than $30,000 as the court considers just. For the purposes of this subsection, all the parts of a compilation or derivative work constitute one work.

**(2)** In a case where the copyright owner sustains the burden of proving, and the court finds, that infringement was committed willfully, the court in its discretion may increase the award of statutory damages to a sum of not more than $150,000. In a case where the infringer sustains the burden of proving, and the court finds, that such infringer was not aware and had no reason to believe that his or her acts constituted an infringement of copyright, the court in its discretion may reduce the award of statutory damages to a sum of not less than $200. . . .

17 U.S.C. § 504; *see also Nelson-Salabes, Inc. v. Morningside Dev., LLC*, 284 F.3d 505, 511-17 & n.9 (4th Cir. 2002).

have a right or ability to supervise or authorize the violative behavior, but he need not have

actually supervised, given authorization, or even had knowledge of the violative behavior. *See,*

*e.g.*, *Shapiro*, 316 F.3d at 306 (holding Green vicariously liable even though "Green did not

actively participate in the sale of the records and that it had no knowledge of the unauthorized

manufacture of the records."); *id.* at 308 ("The imposition of liability upon the Green Company,

even in the absence of an intention to infringe or knowledge of infringement, is not

unusual. . . ."); *Gershwin Publ'g. Corp. v. Columbia Artists Mgmt., Inc.*, 443 F.2d 1159, 1162

(2d Cir. 1971) (explaining that the *Shapiro* court "found the policies of the copyright law would

be best effectuated if Green were held liable, even in the absence of actual knowledge that the

copyright monopoly was being impaired, for its failure to police the conduct of the primary

infringer").[53]

  The "direct financial interest" prong is more difficult to parse and apply. The *Softel* court

refused to find vicarious liability when the only relevant evidence of a "'direct' financial

interest" in the illegal activity was that the individual defendant was president and a shareholder

of the codefendant corporation, because that required inference would be too attenuated. *See* 118

F.3d at 971-72; *accord, e.g.*, *Yue v. Chordiant Software, Inc.*, No. 08-0019, 2009 WL 4931679,

at *7 (N.D. Cal. Dec. 21, 2009) ("The mere fact that a defendant is an officer and shareholder of

---

[53] Still, some courts, largely in the § 605 context because they have allowed the plaintiff to choose between § 553 and § 605, appear to have read *Softel* as requiring actual supervision or authorization. *E.g.*, *J&J Sports Prods., Inc. v. Benson*, No. 06-1119, 2007 WL 951872, at *7 (E.D.N.Y. Mar. 27, 2007) ("To establish a violation of 47 U.S.C. § 605(a) by an individual defendant, plaintiff must show that the individual defendant 'authorized' the violations set forth in the complaint."); *Circuito Cerrado, Inc. v. Pizzeria y Pupuseria Santa Rosita, Inc.*, 804 F. Supp. 2d 108, 113 (E.D.N.Y. 2011) ("[T]he Plaintiff not only fails to allege that Defendant Valle was present on the night of the violation, but it also leaves out the necessary allegation that Valle authorized or supervised the violation." (§ 605)); *J&J Sports Prods., Inc. v. 291 Bar & Lounge, LLC*, 648 F. Supp. 2d 469, 473 (E.D.N.Y. 2009) ("Individual liability under the Cable Act requires that the individual authorize the underlying violations." (§ 605)); *J&J Sports Prods., Inc. v. The Green Plantain, Ltd.*, No. 12-0337, 2013 WL 3322061, at *4-5 (S.D. Ohio July 1, 2013) (§ 605).

an infringing corporation is 'too attenuated' to show a '"direct" financial interest in the exploitation of copyrighted materials.'" (quoting *Softel*, 118 F.3d at 971)). By contrast, the *Softel* court pointed explicitly to *Shapiro, Bernstein & Co. v. H.L. Green Co.*, 316 F.2d 304, in which the Second Circuit Court of Appeals had earlier held that the defendant corporation's contractual entitlement to 10–12% of the infringer's gross receipts was "a most definite financial interest in the success of [the infringer's] concession" permitting the imposition of vicarious liability. *Id.* at 306-08.

Although the evidence in *Softel* was insufficient, *Shapiro*'s facts—of a definite percentage of revenue—have not been interpreted as setting the baseline for a "direct financial interest." As the Ninth Circuit Court of Appeals has explained, "The essential aspect of the 'direct financial benefit' inquiry is whether there is a causal relationship between the infringing activity and any financial benefit a defendant reaps, regardless of *how substantial* the benefit is in proportion to a defendant's overall profits." *Ellison v. Robertson*, 357 F.3d 1072, 1079 (9th Cir. 2004). Thus, if the infringement *causes* a financial benefit to accrue to the defendant, the "direct financial benefit" requirement is met. *Cf. also, e.g.*, *Parker v. Google*, 242 F. App'x 833, 837 (3d Cir. 2007) ("Financial benefit exists where the availability of infringing material acts as a draw for customers." (quoting *Ellison*, 357 F.3d at 1078)). But it is not met, by contrast, if the defendant receives only "flat, periodic payments for service from a person engaging in infringing activity." *Perfect 10, Inc. v. CCBill LLC*, 488 F.3d 1102, 1118 (9th Cir. 2007) (quoting legislative history); *see also, e.g.*, *Fonovisa, Inc. v. Cherry Auction, Inc.*, 76 F.3d 259, 263 (9th Cir. 1996). *See generally* 3 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 12.04[A][2] (Lexis 2013).

In the context of cases like Joe Hand's, then, if defendants like Mr. Yakubets are merely officers of the infringing establishment and receive a set salary, the "direct financial benefit"

requirement cannot be met. If, on the other hand, their compensation increases with the establishment's profits—i.e., from greater profits the night the Match was illegally intercepted and exhibited at Café Nostalgie—the requirement could be met.[54] The rule for vicarious liability under § 553 can be stated, then, as follows: An individual (or business entity) may be held vicariously liable for violating § 553 if he (1) has the right and ability to supervise the violative activity, although he need not actually be supervising, because he need not know of the violative activity, and (2) has a direct financial interest in the violation, i.e., financial benefits, even if not proportional or precisely calculable, that directly flow from the violative activity.

## 2.  Requirements for Pleading Individual Vicarious Liability

What makes cases like the one here close, however, is the arguably ambiguous or conclusory nature of the relevant allegations (compounded, of course, by the lack of evidence concomitant with the default judgment context). For instance, Joe Hand's Complaint makes the following allegations about Mr. Yakubets:

- "Defendant Victor Yakubets is an officer of Cafe Nostalgie, Inc., which owns and operates the commercial establishment doing business as Cafe Nostalgie." Compl. ¶ 7.
- "Defendant Victor Yakubets is also an individual specifically identified on the Pennsylvania Liquor Control Board license issued for Cafe Nostalgie (ABC #R 15626)." Compl. ¶ 8.
- "Plaintiff is informed and believes, and alleges thereon that on August 21, 2010 (the night of the *Program* at issue herein . . . ), Defendant Victor Yakubets had the right

---

[54] The Court recognizes that under this formulation, the standard could be met by multiple individual defendants so long as they all had supervisory authority and responsibility and directly benefited from the § 553 violation. Some courts seem to imply that this result would be problematic, without stating why. *See, e.g.*, *Joe Hand Promotions, Inc. v. Sharp*, 885 F. Supp. 2d 953, 957 (D. Minn. 2012) ("Accepting Joe Hand's logic would . . . automatically blur the distinction between closely held corporations and their individual owners in cases under [§§ 553 and 605].").

and ability to supervise the activities of Cafe Nostalgie, which included the unlawful interception of Plaintiff's *Program*." Compl. ¶ 9.

- "Plaintiff is informed and believes, and alleges thereon that on August 21, 2010 (the night of the Program at issue herein . . . ), Defendant Victor Yakubets specifically directed the employees of Cafe Nostalgie to unlawfully intercept and broadcast Plaintiff's Program at Cafe Nostalgie or that the actions of the employees of Cafe Nostalgie are directly imputable to Defendants [sic] Victor Yakubets by virtue of their acknowledged responsibility for the actions of Cafe Nostalgie." Compl. ¶ 11.

- "Plaintiff is informed and believes, and alleges thereon that on August 21, 2010, Defendant Victor Yakubets as an officer of Cafe Nostalgie, Inc. and as an individual specifically identified on the liquor license for Cafe Nostalgie, had an obvious and direct financial interest in the activities of Cafe Nostalgie, which included the unlawful interception of Plaintiff's Program." Compl. ¶ 12.

- "Plaintiff is informed and believes, and alleges thereon that the unlawful broadcast of Plaintiff's Program, as supervised and/or authorized by Defendant Victor Yakubets resulted in increased profits for Cafe Nostalgie." Compl. ¶ 13.

In addition, Joe Hand offers as evidence Cafe Nostalgie's liquor license, which identifies Victor Yakubets as President, Secretary/Treasurer, Director, Stockholder, and Manager/Steward (only one other individual appears on the license, Yana Vselubsky, who is identified only as Stockholder). What is required to plead vicarious liability (and thus to permit a default judgment), and has Joe Hand met those requirements here?

There are a number of discernible territories in the case law. A number of courts applying the *Softel* standard at the default judgment stage have held such allegations sufficient, usually without much reasoning.[55] But some courts have applied the *Twombly–Iqbal* standard to find the pleading of "mere ownership of the offending entity," inadequate, as in *J&J Sports Productions,*

---

[55] *See, e.g., J&J Sports Prods., Inc. v. Ribeiro*, 562 F. Supp. 2d 498, 501 (S.D.N.Y. 2008); *DIRECTV, Inc. v. Cibulka*, No. 11-0231, 2011 WL 3273058, at *1 & n.2 (M.D. Pa. July 29, 2011); *J&J Sports Prods., Inc. v. Arboleda*, No. 09-0467, 2009 WL 3490859, at *5 (M.D. Fla. Oct. 27, 2009).

*Inc. v. 291 Bar & Lounge, LLC*, 648 F. Supp. 2d 469, 473 (E.D.N.Y. 2009). Similarly, other

courts, as in *J&J Sports Productions, Inc. v. MayrealII, LLC*, 849 F. Supp. 2d 586 (D. Md.

2012), have found insufficient the formulaic recitation of the § 553 or § 605 cause of action plus

the allegation "upon information and belief," that the individuals targeted for vicarious liability

"are 'officer[s], director[s], shareholder[s], employee[s], agent[s], and/or other representative[s]'

of" the offending corporate defendant. *Id.* at 591-92 (alterations in original) (quoting the

complaint).[56]

  Those latter cases present difficult questions regarding the absence of one or both of two

types of allegations: (1) the allegation of a right and ability to supervise and a direct financial

interest in the violation, and (2) a factual allegation that permits the court reasonably to infer that

the allegation of a right and ability to supervise plus a financial interest is not merely conclusory,

but plausible enough to allow the plaintiff to proceed on its complaint. (And, of course, that is

the standard at the default judgment stage.) One position is that satisfying the first type of

---

[56] *See also, e.g.*, *Circuito Cerrado, Inc. v. Pizzeria y Pupuseria Santa Rosita, Inc.*, 804 F. Supp. 2d 108, 113 (E.D.N.Y. 2011) ("[T]he Plaintiff not only fails to allege that Defendant Valle was present on the night of the violation, but it also leaves out the necessary allegation that Valle authorized or supervised the violation. Courts which have more recently addressed this issue of a lack of basic pleading have sided against individual liability. . . ."); *Joe Hand Promotions, Inc. v. Sharp*, 885 F. Supp. 2d 953, 957 (D. Minn. 2012) (citing cases, but pronouncement arguably dicta (summary judgment stage)); *J&J Sports Prods., Inc. v. Fisher*, No. 12-0790, 2013 WL 4482405, at *3 (S.D. Ohio Aug. 20, 2013) ("Courts which have addressed this issue of a lack of basic pleading have sided against individual liability. . . . Because J & J's only allegation against Fisher and Lamar is one of ownership of the violating entity, the Court will not impose individual liability against them."); *J&J Sports Prods., Inc. v. Daley*, No. 06-0238, 2007 WL 7135707, at *3-4 (E.D.N.Y. Feb. 15, 2007) ("Assuming *arguendo* that such a standard is apposite, it is plainly not satisfied on this record. Indeed, to the extent that J & J seeks to rest any legal conclusion on the limited information available about Daley, it draws a factual inference the record cannot support . . . . [T]here is no basis to assume that Daley enjoyed supervisory control (a shareholder or director might not have such authority), or that he had a financial stake in the business (an officer or director might not have such an interest)."); *Torres*, 2009 WL 1774268, at *4.

allegation permits the case to go forward against a motion to dismiss.[57] Another is that both are required, because the first without the second renders the first conclusory and therefore insufficient. *E.g.*, *MayrealII*, 849 F. Supp. 2d at 592. In *MayrealII*, for example, the court explained that

> Plaintiff alleges no facts to show that Mr. Parker (or, for that matter, Mr. Garcia) had personal knowledge of, or the ability to supervise and control, the alleged unlawful interception of the Program. For instance, there is no allegation that the individual defendants were present at the nightclub when the Program was shown, that they personally authorized the interception and display of the Program, or that they authorized advertisements for the display of the Program or the imposition of a cover charge to profit from the display. Indeed, the only specific factual allegations made with respect to Parker and Garcia are that both are named on Mayreal's liquor license, and that Parker is Mayreal's resident agent. In addition, plaintiff alleges conclusorily and upon information and belief that Parker and Garcia are "officer[s], director[s], shareholder[s], employee[s], agent[s], and/or other representative[s]" of Mayreal.

*Id.* (footnote omitted) (alterations in original).

Given that the *Softel* standard does not require actual knowledge or supervision, the *MayrealII* court's point must be that there is no specific factual content that would allow a court reasonably to infer that the plaintiffs *could* exercise control over the violation and that they had a financial interest in the violation. As one court has held, a "general statement of ownership is insufficient to satisfy the threshold for a finding of individual liability," *J&J Sports Prods., Inc. v. Fisher*, No. 12-0790, 2013 WL 4482405, at *3 (S.D. Ohio Aug. 20, 2013); in the words of another, "generalized allegations" that an individual defendant was "an 'officer, director, shareholder and/or principal'" were insufficient because

> [t]he description is disjunctive, and there is nothing in the record to demonstrate which of those various positions, if any, [the individual defendant] actually held. As a result, there is no basis to assume that [he] enjoyed supervisory control (a

---

[57] *E.g.*, *J&J Sports Productions, Inc. v. Dougherty*, No. 12-1255, 2012 WL 2094077, at *2-3 (E.D. Pa. June 11, 2012) ("Thus, like *291 Bar*, the *MayrealII* is distinguishable from the instant case. Plaintiff in this case has alleged that defendants exercised control over Vault and derived direct financial benefit from the unlawful exhibition of the Broadcast.").

> shareholder or director might not have such authority), or that he had a financial
> stake in the business (an officer or director might not have such an interest). In
> short, there is nothing other than speculation to support the conclusion that [he]
> played any part in the violations . . . committed by [the offending commercial
> establishment], and even less to support the conclusion that any role he did play
> would warrant imposing individual liability.

*J&J Sports Productions, Inc. v. Daley*, No. 06-0238, 2007 WL 7135707, at \*3-4 (E.D.N.Y. Feb.

15, 2007).

In the present case, the Court would apply such reasoning to find that the allegation that

Mr. Yakubets "specifically directed the employees of Cafe Nostalgie to unlawfully intercept and

broadcast Plaintiff's Program at Cafe Nostalgie," Compl. ¶ 11 conclusory; in fact, it is a

disjunctive pleading ending with, "*or* that the actions of the employees of Cafe Nostalgie are

directly imputable to Defendants [sic] Victor Yakubets by virtue of their acknowledged

responsibility for the actions of Cafe Nostalgie." Compl. ¶ 11 (emphasis added). As courts in

several of the decisions discussed above have observed, there is simply no factual content in the

Complaint that would put Mr. Yakubets in Café Nostalgie on the night of August 21, 2010, or

that would permit the reasonable inference that he was there and authorized the violation.

But Joe Hand does not need that much. It also alleges (1) that Mr. Yakubets "had the

right and ability to supervise the activities of Cafe Nostalgie, which included the unlawful

interception of Plaintiff's *Program*," Compl. ¶ 9, and that he "had an obvious and direct financial

interest in the activities of Cafe Nostalgie, which included the unlawful interception of Plaintiff's

Program," Compl. ¶ 12; and (2) a liquor license with information permitting the reasonable

inference that the former allegations not conclusory, but plausible, *see* Compl. ¶ 8.

In *MayrealII*, the court cast aside the liquor license evidence; it reasoned that "the only

specific factual allegations," namely, that both individual defendants were "*named* on Mayreal's

liquor license, and that [one was] Mayreal's resident agent," were insufficient. 849 F. Supp. 2d at

592 (emphasis added). And, in fact, all the liquor license showed was that the individual defendants were "[l]icensee(s)."[58]

Café Nostalgie's liquor license, by contrast, identifies Mr. Yakubets as Café Nostalgie's President, Secretary/Treasurer, Director, Stockholder, and Manager/Steward.[59] The significance of the license is that it allows Joe Hand to plead, on *information* and belief, not that Mr. Yakubets was simply some officer of Café Nostalgie, and falter with an alternative or disjunctive allegation, but rather that Mr. Yakubets was *all of* President, Secretary/Treasurer, Director, Stockholder, and Manager/Steward.[60] From this allegation, the Court can make the reasonable inference that Mr. Yakubets had a direct financial interest in the conduct that violated § 553— i.e., that financial benefits flowed to him because of the violative conduct. While his being a stockholder alone might not be enough under *Softel*, as President, Secretary/Treasurer, Director, and Manager/Steward of a commercial establishment (not a Fortune 500 company, for instance), Mr. Yakubets presumably has the authority to control where Café Nostalgie's funds go. This inference is all the more reasonable because the individual defendant's financial position vis-à-vis the offending commercial establishment is likely information difficult to obtain without discovery.[61]

---

[58] *See* Compl. Ex. 1 (Docket No. 1-1), *MayrealII*, No. 11-3345 (D. Md. Nov. 18, 2011).

[59] *See supra* note 4 and accompanying text.

[60] The court will therefore not take the overly formalistic approach of requiring Joe Hand to amend its Complaint just because it states that Mr. Yakubets was "an *officer* of Cafe Nostalgie," Compl. ¶ 12 (emphasis added). The Complaint also makes the necessary allegations identified above, and can reasonably read as incorporating the contents of the liquor license, of which the Court takes judicial notice. *See* Compl. ¶ 8 ("Defendant Victor Yakubets is also an individual specifically identified on the Pennsylvania Liquor Control Board license issued for Cafe Nostalgie (ABC #R 15626)."); *see also supra* note 4 and accompanying text.

[61] *Cf., e.g.*, *Fong v. United States*, 300 F.2d 400, 409 (9th Cir. 1962) ("The facts so stated were in plaintiff's amended complaint well pleaded, and in view of the answer-striking and default order, no further supporting evidence was required. That is true even though plaintiff's

The Court holds that the right and an ability to control plus a direct financial benefit, if not sufficiently pled by the allegations per se, may additionally be *inferred* consistent with the Court's "judicial experience and common sense" under *Iqbal*, *see* 556 U.S. at 679. Joe Hand's Complaint would therefore survive a motion to dismiss, because, "although admittedly formulaic," it "states a claim to relief against each of the individual Defendants that is '"plausible on its face."'" *J&J Sports Prods., Inc. v. L&J Grp., LLC*, No. 09-3118, 2010 WL 816719, at *1-2 (D. Md. Mar. 4, 2010) (quoting *Iqbal*, 556 U.S. at 678).[62] And if such allegations suffice at the pleading stage, they should also suffice at the default judgment stage. Joe Hand may hold Mr. Yakubets vicariously liable for Café Nostalgie's violation of § 553.

But the closeness and narrowness of the holding here must be emphasized. Conclusory allegations "on information and belief" will generally not be enough, even at the default

factual allegations were upon information and belief *because they stated facts primarily within defendant's knowledge*." (emphasis added)).

Indeed, at least one court has explicitly applied this logic in the context of § 553. *See, e.g.*, *Joe Hand Promotions, Inc. v. Blais*, No. 11-1214, 2013 WL 5447391, at *3 (E.D.N.Y. Sept. 30, 2013) ("Plaintiff alleges in the complaint that Tracy Blais had supervisory capacity and control over the activities occurring within the bar on July 3, 2010 and received a financial benefit from its operations. This allegation, even though alleged upon information and belief, is deemed admitted. . . ." (citation omitted) (citing *Fong*, 300 F.2d at 409)); *Kingvision Pay-Per-View Ltd. v. Villalobos*, 554 F. Supp. 2d 375, 381 (E.D.N.Y. 2008) (similar). (And some courts accept the basis of "information and belief" as sufficient without further analysis. *E.g.*, *J&J Sports Prods. v. de Leon*, No. 11-2051, 2012 WL 79877, at *2 (W.D. Ark. Jan. 11, 2012).).

[62] *See also, e.g.*, *J&J Sports Prods., Inc. v. Imperial Lounge & Sports Bar Inc.*, No. 08-2061, 2012 WL 1356598, at *3 (E.D.N.Y. R&R Mar. 30, 2012) ("Plaintiff alleges in the complaint that Sandra D. Gayaram is the owner of Imperial Lounge & Sports Bar. This allegation, even though alleged upon information and belief, is deemed admitted. In addition, defendant Gayaram is named as the principal of Imperial Lounge & Sports Bar Inc. in the records of the New York State Liquor Authority, Division of Alcoholic Beverage Control. Accordingly, I infer from these facts that defendant Gayaram had supervisory control over its activities and received a financial benefit from its operations on May 28, 2005." (citations omitted)), *adopted*, 2012 WL 1372250 (Apr. 19, 2012); *J&J Sports Prods., Inc. v. Bernal*, No. 09-3745, 2010 WL 3463156, at *2-3 (E.D.N.Y. R&R July 28, 2010), *adopted*, 2010 WL 3463162 (Aug. 30, 2010); *J&J Sports Prods., Inc. v. Arhin*, No. 07-2875, 2009 WL 1044500, at *5 (E.D.N.Y. Apr. 17, 2009).

judgment stage, to allow the imposition of vicarious liability. *See, e.g.*, *291 Bar & Lounge*, 648 F. Supp. 2d at 473; *MayrealII*, 849 F. Supp. 2d at 591-92. What tips the scales here is that Café Nostalgie's liquor license—not the fact of the liquor license, but what it specifically states about Mr. Yakubets's role—fills an otherwise empty allegation made "on *information* and belief" with such factual content as permits the inference of Mr. Yakubets's right and ability to supervise paired with a direct financial benefit.

### 3.   The Nature and Extent of Vicarious Liability

Nonetheless, Joe Hand may not hold Café Nostalgie liable for the entire award in this case. Although, to this Court's knowledge, no court finding vicarious liability has discussed the *nature and extent* of that liability—those courts simply allow joint and several liability for the award—the well-established rule in copyright law, from which the *Softel* standard derives, does not permit wholesale joint and several liability on account of vicarious liability.

Under 17 U.S.C. § 504, *see supra* note 52 and accompanying text, "a defendant in a copyright infringement action may be liable for both 'actual damages' and 'profits attributable to infringement.'" *Nelson-Salabes, Inc. v. Morningside Dev., LLC*, 284 F.3d 505, 517 (4th Cir. 2002) (quoting 17 U.S.C. § 504). But vicarious liability does not extend beyond actual damages. Instead, as one court has explained:

> Because infringement of copyright is considered a tort, the general statement often is made that all defendants concerned in the infringement are jointly and severally liable. However, this rule applies only to the defendants['] liability for damages. Insofar as there is liability for illegal profit, the liability is several; one defendant is not liable for the profit made by another.

*MCA, Inc. v. Wilson*, 677 F.2d 180, 186 (2d Cir. 1981) (citations omitted) (citing cases); *accord, e.g.*, *Nelson-Salabes*, 284 F.3d at 517; 3 *Nimmer*, *supra*, § 12.04[C][3] & n.387 (citing cases).

While the actual damages estimation component of § 553's statutory damages, *see supra* subsection III.A.1.a, may be similar enough to actual damages in the copyright context to

warrant joint and several vicarious liability, there should be no joint liability for the profit component of § 553's statutory damages. Nor, for similar reasons, should there be joint liability for enhanced damages under § 553, which are not true damages, but rather penalties aimed to deter and which depend on willfulness, whereas the "right and ability to supervise" standard does not even require knowledge.

In this case, then, Mr. Yakubets is jointly and severally liable for the $500 license fee Joe Hand would have charged Café Nostalgie because this figure represents the actual damages estimation of the statutory damages award. But while the inference that Joe Hand shared in Café Nostalgie's profits is reasonable as a threshold matter to permit vicarious liability, there is no indication or evidence at all of how much of the profits he may have shared, and the Court will not speculate. Nor is there any evidence that Mr. Yakubets *actually* supervised or authorized the violation, or otherwise participated in it; thus, he cannot be personally liable for willful infringement nor vicariously liable for enhanced damages for willful infringement. The Court therefore holds that Mr. Yakubets is jointly and severally liable up to $500 only.

### C.     Leave to File Motion for Attorneys' Fees and Costs

"The court *may* direct the recovery of full costs, including awarding reasonable attorneys' fees to an aggrieved party who prevails." 47 U.S.C. § 553(c)(2)(C) (emphasis added). An award of attorneys' fees and costs under § 553 is discretionary rather than mandatory. *E.g.*, *Burdulis*, 460 F.3d at 170 n.2; *Int'l Cablevision, Inc. v. Sykes*, 997 F.2d 998, 1009 (2d Cir. 1993); *Yakubets*, 2013 WL 5224123, at *4 & n.8. Given the procedural history of this case, Joe Hand should be prepared to address both (a) why Mr. Riley's fees are reasonable and (b) the legal issue of whether the rule that "a judge [not] decrease a fee award based on factors not raised at all by

the adverse party," *Bell v. United Princeton Props., Inc.*, 884 F.2d 713 (3d Cir. 1989), applies to the default judgment context.

**IV.     Conclusion**

Joe Hand's Motion for Default Judgment (Docket No. 14) is granted for, and consistent with, the foregoing reasons and discussion. Joe Hand is awarded $4880 in damages ($1220 statutory, based on an estimate of $500 actual and $720 in profits, plus treble the statutory damages as enhanced damages). Victor Yakubets is jointly and severally liable for $500 of that amount; Café Nostalgie is severally liable for the remainder. Joe Hand is granted leave to file a motion for attorneys' fees and costs.

An Order consistent with this Memorandum follows.

BY THE COURT:

   /s/  Gene E.K. Pratter
GENE E.K. PRATTER
United States District Judge